# EXHIBIT D

Bank of the Ozarks v. Capital Mortg. Corp., Not Reported in F.Supp.2d (2012)

2012 WL 2930479

2012 WL 2930479
Only the Westlaw citation is currently available.
United States District Court,
E.D. Arkansas,
Western Division.

BANK OF THE OZARKS, Plaintiff

v.

CAPITAL MORTGAGE CORPORATION; First Financial Funding, Inc.; Prime Equity Lending, Inc.; Honey Creek Properties, Inc.; Realty Resources Corporation; Ronald Lipsitz, a/k/a Ron Lipsitz; Fred B. Wachter; and David E. Aronstein, Defendants.

No. 4:12–mc–00021 KGB.
|
July 18, 2012.

**Attorneys and Law Firms**

Thomas Eugene Osment, Jr., Bank of the Ozarks, Little Rock, AR, for Plaintiff.

*OPINION AND ORDER*

KRISTINE G. BAKER, District Judge.

### I. Procedural Posture & Background

 **\*1**  Plaintiff Bank of the Ozarks filed a Motion to Quash Subpoena, Motion for Protective Order, and Motion to Stay Deposition (Dkt. No. 1) on July 5, 2012 on this Court's miscellaneous docket. The underlying case is pending in the United States District Court for the Northern District of Georgia. [1] Defendants served George Gleason with a subpoena on June 29, 2012 ("Gleason Subpoena") that commanded him to testify at a deposition in Little Rock, Arkansas on July 9, 2012. Mr. Gleason is the Chairman of the Board and Chief Executive Officer of Bank of the Ozarks. On July 5, 2012, this Court ordered that Mr. Gleason's deposition be stayed pending a resolution of the motion. In that same Order, the Court set forth an expedited briefing schedule. In accordance with that schedule, defendants responded to the motion to quash (Dkt. No. 7), and plaintiff replied (Dkt. No. 11). The Court heard argument on the pending motion at a hearing conducted on July 11, 2012.

[1]   *Bank of the Ozarks v. Capital Mortgage Corporation et al.,* Case No. 1:12–cv–00405–CAP.

This Court has jurisdiction pursuant to Rule 45(c)(3) of the Federal Rules of Civil Procedure, which requires under certain circumstances the "issuing court" to quash or modify a subpoena. For the reasons set out below, the Court quashes the Gleason Subpoena but does so without prejudice to defendants' ability to move the appropriate court for leave to take Mr. Gleason's deposition at a later date, after additional discovery has been completed demonstrating Mr. Gleason has unique personal knowledge unavailable through other less burdensome avenues of discovery.

### II. Discussion

A federal district court has broad discretion with regard to discovery motions. *See United States v. Washington, 318 F.3d 845, 857 (8th Cir.2003).* Plaintiff argues that the Gleason Subpoena should be quashed because it creates an undue burden on Mr. Gleason by running afoul of the apex doctrine. [2] The apex doctrine "protects high-level corporate officials from deposition unless (1) the executive has unique or special knowledge of the facts at issue and (2) other less burdensome avenues for obtaining the information sought have been exhausted." *Wal–Mart Stores, Inc. v. Vidalakis,* 2007 WL 4591569, at *1–2(W.D.Ark., Dec. 28, 2007).* This Court notes that, although the apex doctrine has been discussed when resolving discovery disputes in the Western District of Arkansas, there is no controlling authority that directs this Court to apply the doctrine. *See Vidalakis,* 2007 WL 4591569, at *1–2; Mills v. Wal–Mart Stores, Inc.,* 2007 WL 2298249, at *1–2 (W.D.Ark., Aug. 7, 2007).

[2]   The parties dispute relevance. Plaintiff asserts that the discovery defendants seek by way of the Gleason Subpoena is irrelevant and unnecessary, while defendants contend the opposite is true. This Court's Order, for purposes of resolving this isolated discovery matter, does not address or resolve the issue of relevance.

"Virtually every court that has addressed deposition notices directed at officials at the high level or 'apex' of corporate management has observed that such discovery creates a tremendous potential for harassment." *Celerity, Inc. v. Ultra Clean Holdings, Inc.,* 2007 WL 205067, at *3 (N.D.Cal. Jan. 25, 2007). [3]   Federal

Bank of the Ozarks v. Capital Mortg. Corp., Not Reported in F.Supp.2d (2012)

2012 WL 2930479

Rule of Civil Procedure 26(c) authorizes the Court, for good cause shown, to make any order which justice requires "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense...." Whether the Court applies the apex doctrine or relies solely on the Federal Rules of Civil Procedure, this Court must balance the competing interests of allowing discovery and protecting the parties and deponents from undue burden.

3    Although defendants suggest that the rationale from these cases is inapplicable to the facts presented here, the Court is not persuaded. Bank of the Ozarks operates 114 offices in seven states, and Mr. Gleason is the Chairman of the Board and Chief Executive Officer.

**\*2** This situation is similar to those at issue in *Salter v. Upjohn Co.,* 593 F.2d 649 (5th Cir.1979), and *Baine v. General Motors,* 141 F.R.D. 332 (M.D.Ala.1991). In *Salter* and *Baine,* the courts did not permit depositions of high-ranking company officials to proceed when the Federal Rule of Civil Procedure 30(b)(6) corporate deposition or other depositions of lower-ranking company officials had not been taken first. *Salter,* 593 F.2d at 651 (upholding the district court's requirement that a plaintiff first depose other witnesses before being able to depose the defendant's company president); *Baine,* 141 F.R.D. at 335 (concluding that deposing the vice president of the defendant company would be "oppressive, inconvenient, and burdensome inasmuch as it has not been established that the information necessary cannot be had from [other witnesses]" and the corporate deposition had not yet been taken, which might provide some information plaintiffs were seeking).

Several courts have taken a wait-and-see approach in fashioning an order resolving these types of discovery disputes. In *Celerity,* the court noted that, if it granted plaintiff's motion for a protective order, the court "need not absolutely preclude [defendant] from taking the depositions of Celerity's top two executives, but may merely postpone them until and if [defendant] can demonstrate that other less intrusive discovery methods, such as interrogatories and depositions of Celerity's lower level employees, are inadequate." 2007 WL 205067, at \*4–5. In *Salter,* the Fifth Circuit Court of Appeals stated that "[i]t is very unusual for a court to prohibit the taking of a deposition altogether and absent extraordinary circumstances, such an order would likely be in error." 593

F.2d at 651. The Fifth Circuit upheld the district court's order protecting the president of a drug-manufacturing company from deposition, relying, in part, on the fact that "[t]he trial judge had indicated that if the testimony of the other employees was unsatisfactory, he would allow the plaintiff" to take the deposition. *Id.* The Fifth Circuit concluded that the court's order did not totally prohibit the president's deposition but was merely an exercise of "the broad discretion" a district court has in "controlling the timing of discovery." *Id.*

This Court adopts the wait-and-see approach articulated in *Celerity* and *Salter.* In this case, the parties do not contend that Mr. Gleason lacks personal knowledge. The defendants, however, have not demonstrated that Mr. Gleason's knowledge is truly unique or that they have exhausted less burdensome avenues for obtaining the information they intend to seek from Mr. Gleason. Plaintiff asserts that there are other bank employees who can adequately provide the information sought by defendants. Although defendants contest this point, defendants concede they have not deposed any other employees or officers of Bank of the Ozarks. Defendants also have not submitted to this Court for review any written discovery tailored to obtain the information they intend to seek in Mr. Gleason's deposition.

**\*3** With the discovery deadline in the underlying case now extended to October 1, 2012, defendants have ample time to depose other Bank of the Ozarks employees or officers disclosed by plaintiff, identified in plaintiff's documents, or produced by plaintiff for deposition in response to a properly drawn Federal Rule of Civil Procedure 30(b)(6) notice on the topics about which defendants state they want to inquire. Before deposing Mr. Gleason, defendants should make a good-faith effort to pursue less burdensome avenues for obtaining the information sought. If no other bank employees or officers possess knowledge on the topics identified and defendants can demonstrate to the appropriate court that Mr. Gleason's deposition is necessary to discover unique personal knowledge unavailable through other less burdensome avenues, defendants may move the appropriate court to proceed with Mr. Gleason's deposition.

\* \* \*

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.   2

**Bank of the Ozarks v. Capital Mortg. Corp., Not Reported in F.Supp.2d (2012)**

2012 WL 2930479

For these reasons, the Court quashes the Gleason Subpoena but does so without prejudice to defendants' ability to move the appropriate court for leave to depose Mr. Gleason at a later date, after additional discovery has been completed demonstrating Mr. Gleason has unique personal knowledge unavailable through other less burdensome avenues of discovery.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 2930479

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.   3

2008 WL 4833009
Only the Westlaw citation is currently available.
United States District Court,
W.D. Michigan,
Southern Division.

EL CAMINO RESOURCES, LTD., et al., Plaintiffs,
v.
HUNTINGTON NATIONAL BANK, Defendant.

No. 1:07–cv–598.
|
Nov. 5, 2008.

**Attorneys and Law Firms**

John E. Anding, Thomas Vincent Hubbard, Drew Cooper & Anding, Grand Rapids, MI, John Albert Graham, Jeffer Mangels Butler & Marmaro LLP, Los Angeles, CA, for Plaintiffs.

Amanda May Fielder, Inga April Hofer, James Moskal, Kevin M. Kileen, Matthew T. Nelson, Warner Norcross & Judd LLP, Grand Rapids, MI, for Defendant.

### *MEMORANDUM OPINION*

JOSEPH G. SCOVILLE, United States Magistrate Judge.

**\*1** This is a diversity action brought by two creditors of the now defunct Cyberco Holdings, Inc. The complaint alleges that defendant Huntington National Bank, Cyberco's principal lender, aided and abetted Cyberco in fraudulent conduct, leading to multi-million dollar losses to plaintiffs. The case is now in an extended discovery period, which the court approved in light of the unusual complexity of this case.

Presently pending before the court is plaintiffs' motion to compel the deposition of Thomas Hoaglin, Chief Executive Officer of Huntington National Bank. Defendant opposes the motion, asserting that Hoaglin has no firsthand knowledge of the facts underlying this case, is not listed by any party in its Rule 26 disclosures as a person with knowledge of material facts, and will not be called as a defense witness. Defendant has submitted an affidavit from Mr. Hoaglin, indicating that he does not recall any discussion or other communications with

anyone at the bank about Cyberco during the relevant period and does not remember what, if anything, he knew about this customer of the bank. The affidavit further indicates that Mr. Hoaglin did not communicate with Cyberco or any of its officers, did not give any instructions to anyone at the bank concerning how to handle this account and only has knowledge of the case on the basis of briefings from counsel. Plaintiff, by contrast, asserts that Hoaglin has "personal knowledge of the relationship" between Cyberco and defendant, on the basis of excerpts from the depositions of Larry Hoover and Michael Cross, bank officers who were directly involved in handling the Cyberco account.

The management of discovery is committed to the trial court's discretion. S.S. v. Eastern Ky. Univ., 532 F.3d 445, 451 (6th Cir.2008). Except for a narrow range of discovery issues, such as those involving privileges or work-product immunity, most discovery disputes are resolved by balancing the relevance, importance, and need for the discovery on one hand against the burden, expense, and possibility of waste of time and effort on the other. See FED. R. CIV. P. 26(b)(2)(C). The lower federal courts have frequently applied such a balancing approach to situations in which a party seeks to depose a high-level corporate executive of the opposing party who was not directly involved in the transactions at issue. The need for judicial scrutiny arises from the "tremendous potential for abuse or harassment" possible in such situations. Celerity, Inc. v. Ultra Clean Holding, Inc., No. C 05–4374, 2007 WL 205067, at * 3 (N.D.Cal. Jan. 25, 2007). Where a party seeks to depose an executive officer who appears only remotely connected to the case, the court generally requires a specific showing that the proposed deponent has unique personal knowledge such that the balance of factors weighs in favor of allowing a deposition to proceed. A Judge of the Eastern District has recently summarized the rule as follows:

**\*2** "When a party seeks to depose high-level decision makers who are removed from the daily subjects at issue in the litigation, the party must first demonstrate that the proposed deponent has 'unique personal knowledge' of facts relevant to the dispute." Devlin v. Chemed Corp., 2005 WL 2313859 (E.D.Mich.2005) (citing Baine v. General Motors Corp., 141 F.R.D. 332, 334 (M.D.Ala.1991); Thomas v. International Business Machines, 48 F.3d 478, 483–84 (10th Cir.1995)).

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works. 1

"In the absence of a showing of unique personal knowledge, the circuit courts, including the Sixth Circuit have upheld the entry of a protective order precluding the depositions of high level company executives." *Devlin, supra,* at * 2; *see also Bush v. Dictaphone Corp.,* 161 F.3d 363, 367 (6th Cir.1998) (upholding denial of plaintiff's request to depose high-ranking officer where there was no showing that individual was involved in the termination at issue); *Lewelling v. Farmers Ins. of Columbus, Inc.,* 879 F.2d 212, 218 (6th Cir.1989) (upholding district court's exercise of discretion in granting protective order barring plaintiffs from deposing their employer's chief executive officer, who lacked personal knowledge of relevant facts).

*Marsico v. Sears Holding,* No. 06–10235, 2007 WL 1006168, at * 2 (E.D.Mich. Mar.29, 2007). The Sixth Circuit has indicated that in determining whether it is likely that the executive officer has discoverable knowledge, the trial court may rely upon the officer's affidavit. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.,* 936 F.2d 889, 894 (6th Cir.1991).

The court has carefully reviewed the deposition excerpts and other documentation provided by plaintiffs in support of their contention that Mr. Hoaglin has personal knowledge of the relationship between Cyberco and the bank. The first excerpt comes from the deposition of Larry Hoover, the Executive Vice–President responsible for Huntington's credit activities. Mr. Hoover testified that Hoaglin would have been made aware of the Cyberco situation "at an executive summary level" and that he would have been told of the collection progress being made at monthly risk management committee meetings. At one point, Mr. Hoover testified that Hoaglin likely was not advised of the situation until after the debt was repaid and the FBI report was issued. He was reminded by an exhibit (Plf.Ex. 489), however, that shortly before the final payout the Cyberco situation was discussed at a committee meeting. At best, Hoover's testimony indicates that Hoaglin was made aware of the problems with this account at routine meetings devoted to a summary of major work-out situations. The testimony of Larry Cross, Huntington's Senior Vice–President, is even more tenuous. He testified only that it was possible that he spoke to Hoaglin about Cyberco in a group setting.

When defendant objected to the Hoaglin deposition in its responsive brief, plaintiff sought and was granted leave to file a reply brief. The reply brief relies on a document produced in discovery after plaintiffs filed their original motion. The document is an e-mail dated October 29, 2004, from James Dunlap, the Bank's Regional President for West Michigan, to Ron Baldwin, the Vice–Chairman, and Mr. Hoaglin. The reason for the e-mail was to announce that Cyberco had paid off its debt to the Bank in full. It contains this sentence, "Thanks for your help and support as we worked through this situation." Plaintiffs contend that this document establishes the requisite "unique knowledge" necessary to justify taking Hoaglin's deposition.

**\*3** Plaintiffs' reliance on the October 29, 2004 e-mail is not persuasive. Far from showing "unique knowledge," the e-mail supports the same conclusion established by the deposition testimony: as CEO of a multi-state bank, Mr. Hoaglin was kept generally aware of problem accounts, such as Cyberco, by his subordinates, but knows nothing outside of that which he was told by them. The line of cases dealing with highly-placed executives presupposes that persons in that position will have some knowledge of most corporate affairs, but that they will rarely be involved in substantive decision-making. Therefore, those subordinate officers with substantive knowledge are fair game for discovery, but CEOs, if only remotely involved, are not. It is therefore insufficient to show that a CEO has "some" knowledge—that much is presumed. Rather, plaintiffs must show "unique knowledge." A brief e-mail thanking the CEO for his "support" falls far short of this standard.[1] One would expect that corporate records would disclose many more references to Hoaglin, had he played any substantive role in the Cyberco matter. The production of electronically stored corporate records in this case has been massive. Plaintiffs' inability to point to anything more substantive than the October 24, 2004 e-mail demonstrates rather clearly that Mr. Hoaglin was not directly involved and has no unique knowledge of the facts relevant to this case.[2]

[1] Furthermore, the e-mail comes at the tail-end of the string of events leading up to this lawsuit. Within less than a month, the Cyberco scheme collapsed.

[2] Plaintiffs assert that they are clearly entitled to explore the nature of Hoaglin's "support" for the Bank's collection activities. They do not explain why

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

this is even remotely relevant or helpful to their case. It would be astounding if the Bank's CEO did not "support" efforts to collect a $17 million debt.

The evidentiary material now before the court indicates that, at most, the CEO of the bank was only vaguely aware of the Cyberco situation, as a result of briefings by subordinate officers. These briefings were in the larger context of reporting to the CEO on the universe of troubled loans involving large sums of money. There is no indication that Mr. Hoaglin made any decision concerning the Cyberco account or the bank's efforts to recover amounts due from that customer. Any "personal knowledge" of Mr. Hoaglin was the result of briefings by these officers, all of whom have now been deposed extensively. No evidence indicates that Hoaglin had any direct communication with Cyberco or that he directed any action regarding this customer.

The court finds that the proposed witness, Thomas Hoaglin, has no unique personal knowledge of facts relevant to this case and that the information sought is readily available from other bank officers who were actively involved in the Cyberco account. In these circumstances, the balance of factors made relevant by Rule 26(b) (2)(C) militates against allowing the deposition of Mr. Hoaglin, especially at this late date in the life of this case. In these circumstances, it is not necessary to address defendant's alternative argument based on limitations in the amended case management order.

Plaintiff's motion to compel the Hoaglin deposition will therefore be denied.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 4833009

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 1753982
Only the Westlaw citation is currently available.
United States District Court,
N.D. California.

AFFINITY LABS OF TEXAS, et al., Plaintiffs,
v.
APPLE, INC., Defendants.

No. C 09–4436 CW (JL).
|
May 9, 2011.

**Attorneys and Law Firms**

Thomas W. Sankey, Jordan Thomas Fowles, Duane Morris, LLP, Houston, TX, Brian McQuillen, Duane Morris LLP, New York, NY, David Carl Dotson, Louis Norwood Jameson, Matthew Christopher Gaudet, Stephanie Anne Hansen, Duane Morris LLP, Atlanta, GA, Joseph A. Powers, Duane Morris LLP, Philadelphia, PA, Oliver Edward Benn, Duane Morris LLP, San Francisco, CA, for Plaintiffs.

Darin J. Glasser, O'Melveny & Myers LLP, Newport Beach, CA, Andrew Grant Hamill, Bridges & Mavrakakis LLP, Palo Alto, CA, Anne Elizabeth Huffsmith, Darin Walter Snyder, George A. Riley, O'Melveny & Meyers LLP, San Francisco, CA, Danny Lloyd Williams, Williams Morgan & Amerson P.C., Houston, TX, Neil L. Yang, Ryan K. Yagura, O'Melveny & Myers LLP, Los Angeles, CA, for Defendants.

Nicholas James Whilt, O'Melveny and Myers LLP, Los Angeles, CA, Richard L. Seabolt, Duane Morris LLP, San Francisco, CA, for Plaintiffs/Defendants.

ORDER DENYING MOTION TO
COMPEL DEPOSITION (Docket # 148)

JAMES LARSON, United States Magistrate Judge.

**I. Introduction**

*1 The motion of Plaintiffs Affinity Labs of Texas, et al. to compel the deposition of Defendant Apple's Chief Executive Officer, Steve Jobs, and Apple's motion for protective order to prevent the deposition were submitted without oral argument as provided by Civil Local Rule 7–1(b). All discovery in this case was referred by the district

court (Hon. Claudia Wilken) under 28 U.S.C. § 636(b). The Court carefully considered the moving and opposing papers and the arguments of counsel and hereby denies the motion to compel and grants the motion for protective order. The Court finds that Affinity not only fails to show that Jobs possesses unique, personal non-repetitive firsthand knowledge of relevant facts, but also fails to show that Affinity has exhausted less burdensome means to obtain that information.

**II. Background**

Affinity is a non-practicing entity ("NPE"), which owns and defends patents and engages primarily in litigation. Apple is high on the list of companies most often sued by NPEs. (Ex. 4 to Glasser Declaration ISO Apple's opposition to motion to compel).

Affinity sued Apple in the Eastern District of Texas, alleging willful infringement of U.S. Patent No. 7,187,947, U.S. Patent No. 7,440,772, and U.S. Patent No. 7,486,926 (collectively, the "Patents–in–Suit").

**A. Allegations of the Complaint**

In its complaint Affinity contends:

That Apple's acts of infringement of the #947 Patent include the manufacturing, using, marketing, offering for sale, and/or selling of the iPhone line of products and developing, maintaining, using, marketing, making available, offering to sell and selling software applications for the iPhone line of products through Apple's App Store mobile software application;

That Apple's acts of infringement of the #772 Patent include the manufacturing, using, marketing, offering for sale, and/or selling of the iPhone and iPod Touch line of products and developing, maintaining, using, marketing, making available, offering to sell and selling digital audio through the iTunes software application on a personal computer and through the iTunes mobile software application on the iPhone and iPod Touch line of products: and finally,

That Apple's acts of infringement of the #926 Patent include manufacturing, using, marketing, offering for sale, and/or selling of the iPod, iPhone and iPod Touch line of products that can be integrated with a separate sound system and developing, maintaining, using, marketing,

Case 3:16-cv-03013    Document 71-4    Filed 09/08/17    Page 8 of 20 PageID #: 714

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works. 1

making available, offering to sell and selling digital audio through the iTunes software application on a personal computer that can be transferred to the iPod, iPhone and iPod Touch line of products. (Complaint, Docket # 1)

**B. Procedural Background**

In August 2009, the district court in Texas transferred this case to the Northern District of California, finding that

> Apple's headquarters, many of its employees, and a substantial percentage of the relevant documents and other evidence in Apple's possession are located in the Northern District of California. Although Affinity Labs is a Texas limited liability company with all of its own offices, documents, and witnesses located in Texas, no evidence—and, at best, only one witness—is found within the boundaries of the Eastern District of Texas. Given these facts, the court will grant Apple's motion. This case is transferred to the United States District Court for the Northern District of California.

**\*2** (Order at Docket # 30)

The case was assigned to the Hon. Claudia Wilken. Apple filed a motion to stay pending *inter partes* examination of the patents in suit. (Docket # 49). Although the U.S. Patent Office has granted Apple's application, Judge Wilken denied the motion to stay (at Docket # 63), finding that the patent re-examination process may take an average of 36 months and then more if a party appeals, and that the delay would be prejudicial to Affinity.

The parties were referred to private mediation, and a stipulated protective order was entered. Judge Wilken also denied Affinity's motion to admit evidence of depositions taken in its lawsuit against BMW, finding that Affinity failed to present evidence that the deponents would be unavailable for deposition in this case. (Docket # 92). Judge Wilken denied Apple's motion to file a first amended answer, affirmative defenses and counterclaims, on grounds that Apple had failed to satisfy the requirements of FRCP 16. (Docket # 122).

Discovery was referred to this Court (Docket # 124, 129). The parties had a number of discovery disputes regarding depositions which this Court handled on an expedited bass, and Affinity sought discovery from non-parties AT & T Mobility and Facebook, who filed motions for protective order, which were resolved partly by the parties and partly by this Court. This motion to compel the deposition of Apple CEO Steven P. Jobs was initially filed on letter briefs but the Court ordered the parties to submit formal briefing.

**III. Discovery in Dispute**

**A. Affinity Notices the Deposition of Apple CEO Steve Jobs**

**1. Anticipated Testimony**

Plaintiff Affinity Labs of Texas, LLC ("Affinity") seeks an Order compelling a deposition of Steven P. Jobs, CEO of Defendant Apple Inc. Affinity seeks Mr. Jobs' deposition because he has unique, first-hand knowledge of facts that are relevant to the central issues in this case. Affinity recognizes that Mr. Jobs is the CEO and that Apple would like to shield him under the "apex doctrine." However, that doctrine does not apply to individuals with firsthand knowledge of relevant information. Another court in this district addressed this very issue on March 21, 2011, and is requiring Mr. Jobs to sit for a deposition because of his firsthand knowledge of issues in that case. *Apple iPod iTunes Antitrust Litigation,* C.A. No. C05–00037 JW (HRL), D.I. 543 (N.D.Cal. Mar. 21, 2011).

In the present patent infringement case, Affinity accuses Apple's iPhone, iPod, iPad, iTunes Store, iTunes software, and App Store of infringing three Affinity patents that broadly cover these products and date back to March 2000. Generally, the infringement claims are based on Apple's portable electronic devices (the iPod) and cell phones (the iPhone) that wirelessly download items such as such as music and feature-rich applications. Accordingly, one of the central issues in this case is the value to Apple of its iTunes Store and App Store—i.e., the value of a patent that fundamentally covers the ability of consumers to wirelessly download music and applications to a portable cell phone or MP3 player. Another feature is the software in these devices that allow third-party accessories to control them (e.g., a car stereo that can connect to and control an iPod). Likewise, Apple has

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

asserted that Affinity's patents covering these features are obvious, that these features were not innovative as far back as March 2000.

**\*3** Affinity argues that Mr. Jobs' public statements about the importance of the technology at issue go to the heart of the damages and patent validity issues. Mr. Jobs used such phrases as "innovative," "revolutionary," and "ground breaking" to publicly describe iTunes and the App Store and other accused technology in numerous statements, and did so years after Affinity filed its patents. Affinity characterizes these statements as confirming that the patents certainly would not have been obvious at the early date when they were filed. In addition, Mr. Jobs has made statements about the importance of patents that cover smartphones such as the iPhone, and Apple's views of patents when enforcing its own intellectual property. He has also provided public commentary about a widely reported $100 million patent license that Apple entered into for a single patent on related technology. That patent post-dates the Affinity patents and Affinity claims it is objectively less valuable than Affinity's patents. Apple has told Affinity that it has no documents or analysis of the specific value of any of these claimed features. Affinity argues that Mr. Jobs has firsthand knowledge of these critical issues, as he is the only witness who actually made the specific statements to the public, and that therefore he should be subject to deposition by Affinity.

#### 2. Steve Jobs' role at Apple

Apple is a leading provider of personal computers, mobile communication and media devices, and portable digital music players, and it sells a variety of related software, services, peripherals, networking solutions, and third-party digital applications and content. Glasser Declaration, Ex. 1 at 1. Apple's innovative products are sold in more than 100 countries, and Apple employs more than 45,000 people worldwide. *Id.* at 10.

Apple's success has also attracted unwanted attention. Apple is a frequent target for litigation, including patent litigation by non-practicing entities. PatentFreedom.com-a website devoted to research related to patent enforcement actions-recently identified Apple as the most "relentlessly pursued" operating company by non-practicing entities between 2008 and 2010. Glasser Declaration Ex. 4. Between 2006 and 2010, Apple was named as a defendant in 70 separate lawsuits filed by non-practicing entities. *Id.*

Mr. Jobs co-founded Apple in 1976 and is now its CEO and a director. After leaving Apple in 1986, Mr. Jobs returned in 1997 to lead Apple's historic recovery. As CEO, Mr. Jobs is responsible for the management and oversight of Apple's complex global operations. Mr. Jobs also co-founded Pixar Animation Studios, which created several of the most successful feature-length animated films of all time, including Toy Story, Monsters, Inc., and The Incredibles. Ex. 2. He served as Pixar's CEO from 1986 until 2006, when Pixar merged with The Walt Disney Company. Mr. Jobs is now a member of Disney's board of directors and serves on a six-person steering committee that oversees Pixar. Ex. 3. His time is a critical asset for Apple and Disney, and he carefully manages his schedule to ensure that he can devote the necessary energy, attention and focus to his duties and responsibilities for the benefit of shareholders, customers and employees.

**\*4** Given his leading roles at Apple and Pixar/Disney, Mr. Jobs has become one of the most recognizable CEOs in the world, and he is regularly quoted regarding Apple and its many product offerings. For instance, he has historically provided the keynote presentation at the annual Worldwide Developers Conference, which is one method for Apple to showcase its new software and technologies for developers.

### B. The Parties Meet and Confer

Affinity and Apple met and conferred multiple times, but were unable to resolve this issue. Fact discovery in this case closed on March 21, 2011. (Docket # 128). Affinity filed under seal a full motion to compel this deposition on March 24, 2011 (Docket # 147, 148). If the Court orders Mr. Jobs' deposition, Apple will not oppose scheduling it after the close of fact discovery. (Gaudet Decl. ¶ 24, February 3, 2011 email from Glasser to Gaudet).

### C. Discovery at Issue

#### 1. Mr. Jobs' Statements

Affinity seeks to depose Mr. Jobs on these public statements:

#### (a) Statements about the accused App Store

"The App Store is a grand slam, with a staggering 10 million applications downloaded in just three days.

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.  3

Developers have created some extraordinary applications, and the App Store can wirelessly deliver them to every iPhone and iPod touch user instantly." (Gaudet Decl. 8).

Describing the App Store as follows: "This is the biggest launch of my career." (Gaudet Decl. 9).

"The App Store revolutionized mobile apps." (Gaudet Decl. 10).

"I would now like to talk about the App store for a few minutes. One area we completely changed the value proposition from mobile devices is the App store. Customers will download the 200 millionth application from the App store tomorrow. Only 102 days since its launch on July 11th. The 200 millionth App. We've never seen anything like this in our careers. There are now over 5,500 applications offered on the App store in 62 countries around the world, and the rate of new applications being submitted is increasing every week. Competitors are scrambling to keep our App store, but it's not as easy as it looks, and we are far along in creating the virtuous cycle of cool applications begetting more iPhone sales, thereby creating an even larger market, which will attract even more iPhone software development. It is clear that customers are not attracted to iPhone if[sic]only for its amazing functionality and revolutionary multi-touch user interface, but also for its unique ability to let users easily purchase, download, and use thousands of different applications, raining[sic] from free games to financial planning and health management. All of this in only 102 days." (Gaudet Decl. 11).

"These devices need to work, and you can't do that if you load any software on them. That doesn't mean there's not going to be software to buy that you can load on them coming from us. It doesn't mean we have to write it all, but it means it has to be more of a controlled environment." (Gaudet Decl. 12).

### (b) Statements about the accused Wireless Music Store

**\*5** The Apple press release regarding the Wireless iTunes Store, stating: "With the iTunes Wi–Fi Music Store, music fans can start enjoying their music purchases immediately on their iPod touch or iPhone with no computer required ... If users have only partially downloaded a song or album onto their iPod touch or iPhone their computer will complete the download automatically." ... In the next paragraph, Mr. Jobs states:

"The iTunes Wi–Fi Music Store is really fun-you can browse, search, freely preview, buy and instantly download music right onto your iPod touch or iPhone. Innovative products like this keep iTunes at the forefront of the digital music revolution." (Gaudet Decl. 13).

### (c) Statements about the accused iTunes client software application

"Wouldn't it be awesome if people could buy high-quality audio tracks via the internet and load them directly into iTunes instead of going to the store to buy CDs to rip?" (Gaudet Decl. 14).

"For years, the primary technology was the [marking mechanism] inside a CD or a DVD player. But we became convinced that software was going to be the primary technology, and we're a pretty good software company. So we developed iTunes." (Gaudet Decl. 15).

### (d) Statements about the accused iPod

"Apple has invented a whole new category of digital music player that lets you put your entire music collection in your pocket and listen to it wherever you go. Isn't this cool?" (Gaudet Decl. 14).

"With iPod, listening to music will never be the same again." (*Id.*).

### (e) Statements about the first product that used the allegedly infringing protocol in an iPod that allows an accessory device (such as an automobile stereo) to control a iPod or iPhone

"One of the next frontiers for a seamless digital music experience is the car. We all spend a lot of time driving, and now this elegant solution lets iPod users enjoy their entire music collection in their BMW or MINI." (Gaudet Decl. 16).

"Apple chief executive Steve Jobs called the product a groundbreaking move ... 'They're pretty ugly and they all require you to take your hands off the steering wheel to control them. This adapter is really the first big step to marry an iPod to an automobile.' " (Gaudet Decl. 17).

"Apple and BMW have outpaced the industry around the innovation curve. This elegant solution enables auto

WESTLAW  © 2017 Thomson Reuters. No claim to original U.S. Government Works.  4

enthusiasts to carry with them and enjoy their entire music collection everywhere they go, heightening their ultimate driving experience." (Gaudet Decl. 18).

#### (f) Statements about iTunes

"Software is the user experience. As the iPod and iTunes prove, it has become the driving technology not just of computers but of computer electronics." (Gaudet Decl. 19).

"The mobile phone market-with 1.5 billion subscribers expected worldwide by the end of 2004–is a phenomenal opportunity to get iTunes in the hands of even more music lovers around the world and we think Motorola is the ideal partner to kick this off." (Gaudet Decl. 20).

#### (g) Statements about the importance of patents in the iPhone marketplace

**\*6** "We can sit by and watch competitors steal our patented inventions or we can do something about it. We've decided to do something about it." (Gaudet Decl. 21).

"We think competition is healthy, but competitors should create their own original technology, not steal ours." (*Id.*).

It is these types of statements—made personally by Mr. Jobs—on which Affinity seeks to depose Mr. Jobs. Affinity claims it has jumped through a series of hoops with other witnesses at Apple's insistence. Affinity argues that these witnesses have confirmed a very basic rule of evidence: the person who makes the statement is the person who has firsthand knowledge of that statement and the facts underlying it, and is therefore the person who should be examined regarding the statement.

#### 2. Apple claims Affinity has not sought any discovery on seven of the public statements.

According to Apple, Affinity has not pursued any discovery related to seven of the 18 public statements that form the basis for its request to depose Mr. Jobs. See Def. Motion at Appx. A; PS3, PS5, PS7–10, and PS14. Each of these seven statements was published and available to Affinity before it deposed its first Apple witness in this case on January 25, 2011. *Id.* Affinity's failure to seek any written or deposition discovery on these seven statements before moving to compel Mr. Jobs' deposition should

bar Affinity from deposing Mr. Jobs about those public statements.

Courts regularly require interrogatories, requests for admission, and depositions of lower level employees before allowing the deposition of an apex witness. In *Celerity, Inc.,* 2007 WL 205067, a patent infringement action, defendants claimed plaintiff's corporate officers possessed personal knowledge regarding the chain of title to the patents-in-suit, the decision to acquire certain intellectual property, and the valuation of plaintiff's intellectual property. *Id.* at \*4. This Court agreed that the acquisition of the intellectual property was a "legitimate" area of inquiry, but it granted plaintiff's motion for protective order because defendants failed to show those executives possessed "unique personal knowledge ... unavailable from less intrusive discovery, including interrogatories and the depositions of lower-level employees." *Id.*

Similarly, in *Mehmet v. Paypal, Inc.,* 2009 WL 921637, at \*2 (N.D.Cal. Apr.3, 2009), the court granted a protective order barring the depositions of Paypal executives, noting that "[c]ourts generally refuse to allow the immediate deposition of high-level executives, the so-called 'apex deponents,' before the depositions of lower level employees with more intimate knowledge of the case." And in *First Nat'l Mortgage Co. v. Fed. Realty Inv. Trust,* 2007 U.S. Dist. LEXIS 88625, at \*6–7, 2007 WL 4170548 (N.D.Cal. Nov. 19, 2007), the court required that depositions of lower-level employees must first be taken to establish whether there was a need to depose high-level executives.

**\*7** Because it failed to seek any discovery regarding these seven statements, Apple argues that Affinity's Motion to compel should be denied, and Apple's Motion for protective order should be granted with respect to PS3, PS5, PS7–10, and PS14 identified in Appendix A.

#### 3. Apple's other witnesses

After Apple suggested there were other witnesses who could testify about what Mr. Jobs meant when he made his statements, Affinity deposed the various "substitute" witnesses Apple identified. According to Affinity, those witnesses attempted to dilute the importance of this technology and to re-characterize the statements made by Mr. Jobs, confirming the need to depose Mr. Jobs. In fact, those witnesses merely disagreed with Affinity's

Case 3:16-cv-03013   Document 71-4   Filed 09/08/17   Page 12 of 20 PageID #: 718

paraphrasing or interpretation of Jobs' statements, not with the statements themselves.

Much of this testimony was filed with this Court under seal, as containing highly confidential information. Accordingly, although this Court carefully read all the testimony submitted, it does not repeat it here, nor does it identify the witnesses by name.

### a. Witness A—

During one witness's deposition, Affinity characterized his testimony as discounting Jobs' statements regarding the first product that used the allegedly infringing protocol to allow an accessory device to control an iPod). Many of Jobs' statements were part of documents that were on the exhibit list in a jury trial on related patents that Affinity claims to have won in October 2010 in the Eastern District of Texas. (This is the same trial where witnesses were deposed and Judge Wilken in this case denied Affinity's request to submit the witnesses's deposition testimony as evidence in this case because Affinity failed to show that the witnesses would be unavailable to testify.) That trial was against car manufacturers that offered iPod and iPhone adapters that allowed car users (BMW and Mini) to play and control their Apple devices through their car stereos. (Gaudet Decl. 27). In those statements, Mr. Jobs referred to this technology as "groundbreaking" (among other laudatory statements), described the "innovative" nature of the BMW iPod adapter (which was the first iPod accessory product to make use of the accused functionality), and specifically criticized the prior art in this area. To demonstrate the high probative value of such statements, the Court in the Eastern District of Texas trial specifically cited these types of statements as strong evidence supporting the jury verdict of non-obviousness in denying defendants' JMOLs following the jury verdict. (Gaudet Decl. 28). Indeed, one defendant who settled just before trial put Mr. Jobs on their "may call list" for live trial testimony. (Gaudet Decl. 29, Ex. B to Pretrial Order).

The witness was therefore examined on the following three sets of statements by Mr. Jobs:

**6/21/04 Press Release:** "Apple and BMW have outpaced the industry around the innovation curve," said Steve Jobs, Apple CEO. "This elegant solution enables auto enthusiasts to carry with them and enjoy their entire music collection everywhere they go, heightening their ultimate driving experience." (Gaudet Decl. 18).

**\*8 6/23/04 Australian IT:** "Apple chief executive Steve Jobs called the product a groundbreaking move—one he hopes will lead to more integrated products between the auto industry and Apple's hot-selling iPod portable music player. Current iPod owners usually resort to third-party products, ranging from FM transmitters and cassette adaptors, to use their iPods in their cars. 'They're pretty ugly and they all require you to take your hands off the steering wheel to control them,' Mr. Jobs said in an interview. 'This adapter is really the first big step to marry an, iPod to an automobile.' " (Gaudet Decl. 17).

**6/24/04 Canadian Automotive Network:** " 'One of the next frontiers for a seamless digital music experience is the car,' said Steve Jobs, Apple's CEO. 'We all spend a lot of time driving, and now this elegant solution lets iPod users enjoy their entire music collection in their BMW or MINI.' " (Gaudet Decl. 16).

According to Affinity, at his deposition the witness attempted to completely change the meaning of these statements. Affinity argues that the witness testified that the BMW iPod adapter was neither innovative, groundbreaking, nor the next frontier of anything. In fact, this Court finds that the witness merely disagreed with Affinity's paraphrasing and interpretation of Jobs' statements.

Affinity tries to criticize the witness's testimony in two contradictory ways: First it claims that he disagrees with Jobs' statements and then it claims that he didn't hear Jobs make the statements in exactly the same words as Affinity is quoting. The Court finds that this type of quibbling over manufactured differences does not justify deposing Mr. Jobs.

### b. Witness B—

Affinity questioned this witness on Jobs' public comments on Apple's $100 million patent license with Creative. The Creative agreement involved a patent license in which Apple paid $100 million for a license to an iPod-related patent with a 2001 priority date (i .e., a year later than Affinity's priority date). This was the press release about that license:

CUPERTINO, California and SINGAPORE—August 23, 2006—Apple® and Creative Technology, Ltd. today announced a broad settlement ending all legal

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works. 6

disputes between the two companies. Apple will pay Creative $100 million for a paid-up license to use Creative's recently awarded patent in all Apple products. Apple can recoup a portion of its payment if Creative is successful in licensing this patent to others. In addition, the companies announced that Creative has joined Apple's "Made for iPod" program and will be announcing their own iPod® accessory products later this year.

"Creative is very fortunate to have been granted this early patent," said Steve Jobs, Apple's CEO. "This settlement resolves all of our differences with Creative, including the five lawsuits currently pending between the companies, and removes the uncertainty and distraction of prolonged litigation."

(Gaudet Decl. 31).

**\*9** According to Affinity, the witness by his testimony effectively disavowed the second sentence in the press release. When Affinity confronted the witness with the direct quote from Jobs about the basis for the value of that single patent that the press release identified, according to Affinity, he again attempted a swift retreat (Affinity's characterization) from Mr. Jobs' statements. Then, according to Affinity, the witness finally admitted that his testimony did not even rise to the level of hearsay because he never heard Mr. Jobs say the words that Mr. Lutton was attributing to him.

This Court finds that, in this line of questioning, Affinity tries to induce Witness B to say that Jobs either never told him what he meant by "early," or else told him something different from what Affinity contends Jobs meant by "early," but instead, Witness B testifies that "early" in this press release refers to more than one patent, and not just the patent that Affinity claims is relevant, and also that, since he worked closely with Jobs on drafting the language of the press release, Witness B knew what "early" meant without Jobs' telling him directly, "Hey, this is what I mean by 'early.' "

#### c. Witness C

Like the other two witnesses, Witness C, according to Affinity, took great pains to "explain away" Mr. Jobs' statement, in a press release that says the following:

With the iTunes Wi–Fi Music Store, music fans can start enjoying their music purchases immediately on their iPod touch or iPhone with no computer required ... If users have only partially downloaded a song or album onto their iPod touch or iPhone their computer will complete the download automatically. (Gaudet Decl. 13)

In the next paragraph, Jobs stated that "Innovative products like this keep iTunes at the forefront of the digital music revolution." (*Id.*).

Affinity interprets Witness C as disputing even brief, straightforward statements made by Mr. Jobs about the App Store, for which Affinity argues the only remedy is to examine the source of the statements, Jobs himself. In fact, after reading the transcript of his testimony, this Court finds that Witness C is merely pointing out to Affinity that two concepts were presented in two different sentences and that the statement about innovative products refers to products encompassed in the "whole press release."

Affinity goes on to point to what it considers to be another example: when discussing the launch of the App Store, Jobs was quoted as saying "[t]his is the biggest launch of my career." (Gaudet Decl. 9). Affinity questioned Witness C about this statement in an attempt to elicit a disagreement with the substance of what Jobs was saying. In fact, after reviewing the testimony, this Court finds that the witness is disagreeing with Affinity's interpretation and paraphrasing of Jobs' statement, not Jobs' statement itself.

None of these three witnesses contradict Mr. Jobs' statements, rather they merely disagree with Affinity's paraphrasing and interpretation of the statements and resist Affinity's attempts to manipulate and distort their own testimony.

#### 4. Affinity has not shown that Mr. Jobs has unique, non-repetitive, firsthand knowledge of the remaining 11 statements.

##### a. Affinity failed to take written discovery

**\*10** Affinity argues that it would be entitled to take Mr. Jobs' deposition regardless of the content of the witnesses's testimony because—by definition—Mr. Jobs has firsthand knowledge about what he meant about his numerous statements on highly relevant, hotly contested issues. Affinity claims that Apple's witnesses' attempts to

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works. 7

explain away and water down Mr. Jobs' statements about these critical issues highlight its need for the deposition.

Affinity cannot show that Mr. Jobs has unique, non-repetitive, firsthand knowledge of relevant facts regarding the other 11 public statements or that Affinity has exhausted, without success, less burdensome means to obtain the same information.

Affinity's sole support for its claim that Mr. Jobs has unique, non-repetitive, firsthand knowledge is that he must know about the statements because he made them. Motion at 17. None of the cases cited by Affinity, however, support the broad proposition that the requisite knowledge can be established by public statements alone. Even if Mr. Jobs has personal knowledge of the years-old statements and even if they were relevant to this case—and as shown below, they are not—Apple's other witnesses testified fully and consistently with the 11 statements on which Affinity's Motion is based.

Affinity also failed to serve any written discovery to obtain the information it seeks, thus failing to exhaust less burdensome means to obtain it. Affinity concedes that it has not served any written discovery on these 11 statements. Motion at 21, fn7.

Written discovery could have provided the information it now allegedly seeks. For instance, Affinity could have served interrogatories seeking the reasons why Mr. Jobs made the statements and the identification of Apple witness(es) with equal or better personal knowledge of those statements. And if Affinity needed to confirm that Mr. Jobs made any statements, requests for admissions are far less burdensome than the deposition of Mr. Jobs. Affinity did not attempt to learn any of those facts through written discovery, as the rule requires, See, e.g., *Mulvey v. Chrysler Corp.,* 106 F.R.D. 364, 366 (D.R.I.1985).

Affinity attempts to excuse its failure to pursue written discovery by claiming it deposed Apple's lower-level witnesses near the close of fact discovery and, as a result, it did not have time to serve interrogatories after those depositions were concluded. Motion at 21, fn. 7. But most of the statements on which Affinity seeks to depose Mr. Jobs have been known to Affinity for years. Affinity could have—and should have under the apex doctrine—served interrogatories well before the close of fact discovery.

Affinity's delay in taking depositions does not excuse its failure to serve interrogatories.

When Affinity chose to pursue discovery regarding the public statements, it consistently obtained the information to which it is entitled. As shown below, Affinity received deposition testimony from other Apple witnesses on the public statements (regardless of relevance) in each of the categories Affinity identifies. This deposition testimony confirms that Mr. Jobs does not possess any unique or non-repetitive knowledge on relevant topics that justifies his deposition.

### b. Affinity received sufficient testimony regarding Mr. Jobs' statements about the release of the BMW iPod Adapter (PS11–13).

**\*11** The statements attributed to Mr. Jobs relating to the 2004 release of BMW's iPod Adapter (PS11–13) are not relevant to any claims at issue in this case. To support its claim of relevance, Affinity points to Judge Clark's comment following a trial in the Eastern District of Texas that the "buzz" surrounding the introduction of the BMW Adapter weighed in favor of non-obviousness of Affinity's #833 Patent. Motion at 9–10, fn2–3. Apple was not a party to that litigation and the #833 Patent is not at issue here. Unlike the patents at issue in the case before Judge Clark, the patents at issue in this case do not claim an automobile sound system. Any obviousness analysis must relate to the claims of the Patent–in–Suit. *Iron Grip Barbell Co., Inc. v. USA Sports, Inc.,* 392 F.3d 1317, 1324 (Fed.Cir.2004). In addition, to prove commercial success, which can be an example of secondary considerations of non-obviousness, a "nexus must be established between the merits of the claimed invention and evidence of commercial success before that evidence may become relevant to the issue of obviousness." *Id.* Mr. Jobs' statements have nothing to do with the narrow and specific claims of the patents at issue, but instead relate generally to a product released by third party BMW.

Even if Mr. Jobs' statements were relevant, Affinity has already obtained complete testimony from Witness A, who confirmed that Jobs does not have unique, non-repetitive knowledge about the statements. Affinity alleges that Witness A attempted to discount Jobs' statements regarding the innovative nature of BMW's iPod Adapter when he testified. This Court finds that the witness's statements are entirely consistent with those

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

8

of Mr. Jobs, who was quoted as saying that other, less elegant, solutions existed before the BMW iPod Adapter:

> They're pretty ugly and they all require you to take your hands off the steering wheel to control them ...

> This adapter is really the first big step to marry an iPod to an automobile.

Ex. 27.

This case is unlike *Paice, LLC v. Toyota Motor Corp.,* C.A. No. 2:07–CV–180 DF, Dkt. # 117 (E.D.Tex. July 21, 2009), an unpublished decision from 5th Circuit in which the plaintiff argued that Toyota witnesses took positions "directly counter to numerous statements made by [executive] Mr. Press." Witness A's testimony is entirely consistent with Mr. Jobs' statements regarding the BMW iPod Adapter. Affinity is unable to point to any disavowals or contradictory statements by Witness A suggesting that Mr. Jobs has unique, firsthand knowledge of the statements regarding the release of the BMW iPod Adapter.

Attempting to manufacture a conflict where none exists, Affinity states in a footnote that Witness A disagreed with a statement by Mr. Jobs that the iTunes Music Store "revolutionized the way people legally buy music." Motion at 11–12, fn11. But Affinity does not identify this statement as one of the 18 on which it seeks to depose Mr. Jobs. See Appx. A. And Apple never suggested that Witness A would be an appropriate witness to depose on statements regarding iTunes. Witness A's responsibilities at Apple have consistently related to Apple's portable products. Ex. 22 at 12:25–14:2. Regardless, Witness A did not disagree with the statement; he simply testified that the iTunes and iTunes Music Store personnel were "very hopeful that they could provide, again, a better experience for our customers." *Id.* at 45:6–46:1.

### c. Affinity received sufficient testimony regarding Mr. Jobs' statement about Apple's settlement with Creative Labs (PS18).

**\*12** Affinity deposed Witness B, regarding a lone public statement about Apple's 2006 settlement with Creative Labs: "Creative is very fortunate to have been granted this early patent." Affinity is incorrect that the settlement with Creative is relevant to this litigation, and it is wrong that

Witness B's testimony somehow justifies Affinity taking Mr. Jobs' deposition.

Controlling Federal Circuit precedent confirms that the Creative settlement is not relevant to the damages calculus in this case. *ResQNet.com, Inc. v. Lansa, Inc.,* 594 F.3d 860, 869 (Fed.Cir.2010). In *ResQNet.com,* the court vacated a damages award where the plaintiff's expert relied on prior licenses, some of which had no discernible link to the claimed invention at issue in the dispute between ResQNet.com and Lansa. *Id.* at 870. Affinity has similarly failed to allege a link between the claims of the patents in this litigation and any rights Apple obtained under the Creative Labs settlement. The fact that a Creative Labs patent had a priority date after Affinity's does not supply that link because, as Witness B explained, the priority dates say nothing about their respective subject matter. Ex. 23 at 107:16–111:4. Moreover, as confirmed by Witness B during his deposition, the Creative Labs settlement is not a simple license: it created a bi-lateral business relationship that resolved five lawsuits between Apple and Creative Labs (significant competitors) and-contrary to Affinity's suggestion-involved literally hundreds of patents. Ex. 23 at 64:14–65:4, 67:16–72:3. Notably, even Affinity's own damages expert, Walter Bratic, stated in his April 1, 2011 expert report that he did not rely on the Creative Labs settlement in forming his opinions because he did not find it relevant. Ex. 28, Expert Report of Walter Bratic at 163–66.

Regardless, Witness B provided sufficient testimony about the Creative Labs settlement. He explained, in detail, that the settlement granted Apple, among other things, a broad portfolio license. Ex. 23 at 64:18–65:4.

This case thus differs from the situation in *Kennedy v. Jackson Nat'l Life Ins. Co.,* 2010 U.S. Dist LEXIS 47866, at *4–5, *7–8, 2010 WL 1644944 (N.D.Cal., Apr. 22, 2010), a case cited by Affinity, where a limited deposition of the CEO was permitted because other witnesses identified the CEO as having unique knowledge. Witness B substantively answered all of Affinity's questions, and he never indicated that Mr. Jobs had unique knowledge that this witness could not provide. The fact that Witness B may not have provided the answers that Affinity wanted is not a basis to depose Mr. Jobs. As this Court noted in *Doble:*

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works. 9

> Although Plaintiffs have perhaps not obtained the answers they wanted from lower level employees, that failure does not automatically justify their reaching higher, without the requisite showing of the higher-level official's unique personal knowledge.

*Doble v. Mega Life and Health Ins. Co.,* 2010 WL 1998904 at \*4 (N.D.Cal., 2010).

### d. Affinity received sufficient testimony regarding Mr. Jobs' statement about iTunes and iTunes WiFi Music Store (PS6, 15).

 **\*13** Affinity in its Motion does not even try to explain how Mr. Jobs' general statement about the innovative nature of iTunes and the iTunes WiFi Music Store is relevant to this case. None of the Patents–in–Suit broadly covers these applications. Instead, the asserted claims—even as broadly construed by Affinity—address specific aspects of cellular phones that perform particularized functions, such as streaming audio to cellular devices or previewing songs on the iTunes Store. Ex. 9 at A5–6, A11–12, A14–16, A20–28.

Affinity's Motion also fails to explain how other witnesses' testimony about these public statements justifies Mr. Jobs' deposition. Although it argues that Witness C "took great pains to explain away Mr. Jobs' statement," Affinity does not identify any disavowal or contradictory testimony by Witness C. For instance, Affinity questioned Witness C about a press release regarding, among other things, the iTunes WiFi Music Store and a custom ringtone maker, in which Mr. Jobs stated that "Innovative products like this keep iTunes at the forefront of the digital music revolution." Ex. 24 at 124:11–127:20. Witness C never testified that he disagreed with Mr. Jobs' statement. *Id.* Rather, he correctly noted that because "innovative products" is plural, it likely refers to the Wi–Fi Music Store as well as to other products and features also mentioned in the press release, such as custom ring tones and the added capabilities for watching movies and TV shows. *Id.* at 124:17–127:20. Even if Witness C's testimony was not sufficient (which it is), Affinity neglects to mention that it also asked another witness the specific question about the WiFi Music Store and received

a sufficient response, as this Court discerned from its reading of the witness's testimony.

And although Affinity contends it needs to depose Mr. Jobs about his statement regarding iTunes (Appx. A; PS15), Affinity's Motion fails to mention that this same witness agreed with Mr. Jobs' statement that the mobile phone market was an opportunity to get iTunes in the hands of music lovers. Ex. 25 at 176:22–177:15.

### e. Affinity received sufficient testimony regarding Mr. Jobs' statements about the App Store (PS1, 2, 4).

Affinity also accuses Witness C of (1) downplaying Mr. Jobs' statement (PS1) that the App Store was a "grand slam" and (2) disputing Mr. Jobs' "straightforward" comment (PS2) that the App Store "is the biggest launch of my career." Motion at 16. Affinity's selective quotation from the witness's deposition misleadingly obscures that his testimony fully answered Affinity's questions and was completely consistent with Mr. Jobs' statements. Affinity does not explain how the testimony about Mr. Jobs' statement is deficient, let alone why it justifies Affinity taking Mr. Jobs' deposition. Affinity also fails to mention that when asked why Mr. Jobs said the App Store was a "grand slam," another Apple witness also provided testimony consistent with Mr. Jobs' statement, as confirmed by this Court's reading of that testimony.

 **\*14** And far from disputing Mr. Jobs' comment (PS2) that the App Store was the biggest launch of Mr. Jobs' career, the witness simply corrected Affinity's mischaracterization and clarified that Mr. Jobs said, "[t]his is the biggest launch of my career" and not, "The App Store is the biggest launch of my career."

Affinity also argues that a deposition of Mr. Jobs is necessary because the witness suggested that the quote might not be accurate. Motion at 16, fn 5. But if Affinity ever had any doubt about the accuracy of any of Mr. Jobs' statements, it could have propounded requests for admissions. Affinity failed to exercise this less intrusive method of discovery. Despite claiming that Mr. Jobs statement is solely relevant to the damages issue of whether the App Store drives sales of the iPhone, Affinity did not ask Apple's Rule 30(b)(6) witness on financial topics a single question about Mr. Jobs' statements.

Affinity also argues that it needs to depose Mr. Jobs about a statement (PS4) made during Apple's October

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2008 earnings call regarding the App Store. Motion at 6. Witness C, however, already answered Affinity's question about the statement, and furthermore, Affinity's Motion fails to identify any deficiency in the witness's testimony about the statement, let alone a disavowal or contradiction of Mr. Jobs' statement.

### f. Affinity received sufficient testimony regarding Apple's litigation against HTC (PS16–17).

Affinity does not attempt to show that other discovery has been insufficient on Mr. Jobs' two statements regarding Apple's litigation against HTC, although Affinity maintains its request to depose Mr. Jobs on those statements. Motion at 19. Nor does Affinity offer any explanation of how such statements might be relevant to this litigation. These statements were made when Apple filed actions on March 2, 2010 in the U.S. International Trade Commission and in Delaware against cell phone competitor HTC for infringing a total of 20 Apple patents. If a general statement about patent rights could be used as the basis to depose a CEO, the apex rule would be meaningless with respect to technology companies, whose executives often make statements about the importance of protecting their intellectual property.

Witness B's testimony differs dramatically from the testimony presented in *Paice,* in which Toyota witnesses denied any involvement in crafting the public statements or press releases of the COO and took positions that directly contradicted the statements by their COO. The situation is also different than the one in *First United Methodist Church of San Jose v. Atlantic Mutual Ins. Co.,* 1995 WL 566026, at *2–3 (N.D. Cal., Sept 19, 1995). In *First United Methodist,* the court permitted the deposition of Atlantic Mutual's president based on the president's personal knowledge of the plaintiff's insurance program and personal involvement in the decision to stop insuring plaintiffs. In this case, however, there is no suggestion that Mr. Jobs has any knowledge of Affinity, its owners or the Patents–In–Suit.

 **\*15** Most importantly, Affinity's Motion fails to identify any additional information it needs from Mr. Jobs that it has not already learned from the depositions of Apple witnesses, or that it could have learned through written discovery.

### IV. Analysis

"A party seeking to prevent a deposition carries a heavy burden to show why discovery should be denied." *Websidestory, Inc. v. Netratings, Inc.,* C06cv408, 2007 WL 1120567 *2 (S.D.Cal., Apr.6, 2007).* When a party seeks the deposition of a high-level executive (a so-called "apex" deposition), the court may exercise its discretion under the federal rules to limit discovery. *See id.;* Fed.R.Civ.P. 26(b)(1)-(b)(2). In determining whether to allow an apex deposition, courts consider (1) whether the deponent has unique first-hand, non-repetitive knowledge of facts at issue in the case and (2) whether the party seeking the deposition has exhausted other less intrusive discovery methods. *Websidestory, Inc.,* 2007 WL 1120567 at *2. Absent extraordinary circumstances, it is very unusual for a court to prohibit the taking of a deposition. *Id.* Additionally, "when a witness has personal knowledge of facts relevant to the lawsuit, even a corporate president or CEO is subject to deposition." *Id.* A claimed lack of knowledge, by itself, is insufficient to preclude a deposition. *Id.* "Moreover, the fact that the apex witness has a busy schedule is simply not a basis for foreclosing otherwise proper discovery." *Id.*

That said, "Virtually every court that has addressed deposition notices directed at an official at the highest level or 'apex' of corporate management has observed that such discovery creates a tremendous potential for abuse or harassment." *Celerity, Inc. v. Ultra Clean Holding, Inc.,* No. C05–04374 MMC (JL), 2007 WL 205067 *3 (N.D.Cal., Jan.25, 2007).

For that reason, parties seeking to depose a high ranking corporate officer must first establish that the executive (1) has unique, non-repetitive, firsthand knowledge of the facts at issue in the case, and (2) that other less intrusive means of discovery, such as interrogatories and depositions of other employees, have been exhausted without success. *Salter v. Upjohn Co.,* 593 F.2d 649, 651 (5th Cir.1979). "Where a high-level decision maker 'removed from the daily subjects of the litigation' has no unique personal knowledge of the facts at issue, a deposition of the official is improper." *Id.* (quoting *Baine v. General Motors Corp.,* 141 F.R.D. 332, 334 (M.D.Ala.1991)). "This is especially so where the information sought in the deposition can be obtained through less intrusive discovery methods (such as interrogatories) or from depositions of lower-level employees with more direct knowledge of the facts at issue." *Id.*

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works. 11

Affinity misstates the standard for deposing a CEO, claiming it is sufficient to show that Mr. Jobs has "firsthand knowledge of relevant information." Affinity relies on a decision from the San Jose division of this district, in the *Apple iPod iTunes Antitrust Litigation,* C.A. No. C05–00037 JW (HRL), D.I. 543 (N.D.Cal. Mar. 21, 2011). However, Magistrate Judge Howard R. Lloyd designated the decision as "Not for Citation," under Civil Local Rule 3–4(e).

**\*16** Civil Local Rule 3–4(e), Prohibition of Citation to Uncertified Opinion or Order provides:

> Any order or opinion that is designated: "NOT FOR CITATION," pursuant to Civil L.R. 7–14 or pursuant to a similar rule of any other issuing court, may not be cited to this Court, either in written submissions or oral argument, except when relevant under the doctrines of law of the case, res judicata or collateral estoppel.

Affinity fails to indicate how its citation falls into any of the designated exceptions. Although Jobs' deposition was at issue in the *Apple iTunes Antitrust Litigation,* that is not enough to make the decision to permit a limited deposition of Mr. Jobs in that case does not amount to law of the case, res judicata, or collateral estoppel in this case. Accordingly, the Court finds that Affinity improperly cited this decision, which doesn't really help its cause anyway. Judge Lloyd expressly rejected the same theory which Affinity proffers in this case: that a CEO's firsthand knowledge of his own public statements justifies the CEO's deposition.

Here, Affinity cannot meet its burden to show that Mr. Jobs has "unique" and "non-repetitive" knowledge regarding any relevant topic that is not available through less burdensome means. Affinity does not even try to contend that Mr. Jobs has any knowledge of Affinity, its patents, the inventors of those patents, or infringement by Apple products. Instead, based only on Mr. Jobs' public statements regarding Apple products or other patents or lawsuits, Affinity asks the Court to conclude that Mr. Jobs has relevant firsthand knowledge that entitles Affinity

to depose him. But Apple has never denied that Mr. Jobs made the statements attributed to him in Apple press releases or presentations. And Apple has produced witnesses with firsthand knowledge of the statements Affinity has identified and the surrounding circumstances. Nor has Affinity even claimed that Jobs' statements run counter to the statements of Apple's witnesses, as discussed in the *Paice* case, on which Affinity relies to justify Jobs' deposition. *Paice, LLC v. Toyota Motor Corp.,* C.A. No.2:07–CV–180 DF (E.D.Tex. Sept.6, 2006) (Ex. 42 to Declaration of Matthew Gaudet).

In the course of its questioning Affinity tried to maneuver the witnesses into contradicting Jobs' statements, but they didn't do it. What the witnesses may have done is disagree with Affinity's interpretation or paraphrasing of Jobs' statements. That does not amount to justification for deposing Jobs and then arguing with him over what he meant, the way Affinity's counsel did with the Apple witnesses.

The mere fact that Jobs made public statements, even on issues that Affinity considers relevant to its claims, are insufficient to justify his deposition. Courts have repeatedly denied apex depositions even on a showing that the executive made public statements on relevant issues. *Mulvey, id.,* 106 F.R.D. at 366 (rejecting plaintiffs' request to depose Lee Iacocca based on public statements he made relevant to Chrysler's liability, and instead requiring plaintiffs to submit written interrogatories in the first instance); *Salter,* 593 F.2d at 651 (5th Cir.1979) (upholding district court's decision to vacate the deposition date of Upjohn's president, Dr. William Hubbard, where Dr. Hubbard had even given testimony before the United States Senate concerning the testing, marketing and use of the drug on which the plaintiff's claim was based); *Thomas v. IBM,* 48 F.3d 478, 483 (10th Cir.1995) (granting a protective order barring the deposition of IBM chairman John Akers even though he allegedly "authored an IBM policy designed to discriminate against older employees."); see also *Celerity, Inc.,* 2007 WL 205067, at \*5 (refusing to permit deposition to go forward based on plaintiffs' claims that executives "participated" in relevant events where knowledge was not unique to those executives).

**\*17** Apple also contends that Mr. Jobs' deposition should not be allowed because Affinity has used all of its allotted deposition time. (Opp. p. 24). Affinity

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works. 12

opposes this contention on grounds that Apple forced Affinity to depose multiple "substitute witnesses" as a predicate to deposing Mr. Jobs, and now that Affinity has done so, Apple argues that "time is up." Affinity denies that it exceeded its deposition time limits, and even if it did, then additional time would be appropriate specifically for this deposition. (Footnote 12 to Affinity's Reply brief restates the argument it previously made before this Court). This Court expressly found that it could not render a decision on the merits of Apple's arguments relating to Affinity's use of deposition hours, which Affinity disputed. (D.I. 134 at p. 2 ("... [T]his dispute exceeds the scope of the referral to this Court.")). The Court noted that "[t]he parties' appropriate course of action is to seek a decision by Judge Wilken whether the deposition cap has been exceeded...." (*Id.*). Apple never sought a decision from Judge Wilken because the parties entered into a stipulation allowing Affinity to conduct additional depositions. (D.I.139). Thus, a decision on whether Affinity exceeded its allotted deposition hours has not been made.

Finally, Affinity argues that Apple incorrectly alleges that Affinity deposed Creative. (Opp. p. 25). In fact, Affinity claims it was Apple who scheduled the Creative Deposition. (Gaudet Decl. II ¶ 8). Affinity simply attended Apple's deposition and cross-examined the witness.

### V. Conclusion and Order

In this case, Affinity fails to show that Steve Jobs has unique and personal knowledge of facts relevant to this litigation, which cannot be obtained through less intrusive discovery, for example, interrogatories, requests for admissions, or other depositions. Accordingly, Affinity's motion to compel the deposition of Steve Jobs is denied and Apple's motion for protective order is granted.

IT IS SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2011 WL 1753982

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works. 13