**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | |
|---|---|
| **CHARLES BRIAN FOX and MEGAN FOX,** ) <br> **Individually and as Parents and Next Friends of** ) <br> **HAILEY FOX, MATTHEW FOX, REBECCA** ) <br> **FOX, and SARAH FOX, individually,** ) <br> ) <br> **Plaintiffs** ) <br> ) <br> **v.** ) <br> ) <br> **AMAZON.COM, INC.,** ) <br> **W2M TRADING CORPORATION,** ) <br> ) <br> **Defendants.** ) | **Case No.: 3-16-cv-03013** <br> **District Judge William L. Campbell, Jr.** <br> **Magistrate Judge Jeffery Frensley** <br> **JURY DEMAND** |

**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT**

Pursuant to Local Rule 56.01(b), Plaintiffs hereby submit the following statement of material facts as to which there is no genuine issue for trial:

1.     In 2015, Amazon made a corporate decision to move away from direct sales of hoverboards and to rely almost exclusively on so-called third-party sales.  *See* Jones Depo. at 56, 104.

**RESPONSE:**

2.     On November 3, 2015, Mrs. Fox used her existing account with Amazon to purchase the FITURBO F1.  *See* Brian Fox Depo. at 35-41; Second Am. Complaint, ¶ 6; Answer, ¶ 6.

**RESPONSE:**

3.     The FITURBO F1 was described as having an "original Samsung advanced battery pack."  *See* Second Am. Complaint, ¶ 7; Answer, ¶ 7.

**RESPONSE:**

1

4.      After providing her credit card information, Amazon charged Mrs. Fox the entirety of the hoverboard purchase price of $274.79.  *See* Jones Depo. at 77.

**RESPONSE:**

5.      Prior to Mrs. Fox's purchase of the hoverboard, Mr. Fox had investigated hoverboards, which included visiting Amazon's website and reading hoverboard reviews and comparing the component parts.  *See* Brian Fox Depo. at 35-41.

**RESPONSE:**

6.      The purchase receipt was sent by "amazon.com," and contained Mrs. Fox's billing address, the shipping address, the order date, shipment date, the detailed product description, the purchase price, tax, and receipt number. *See* Jones Depo. at 68-69, 72-73; FOX_AMZ 0002.

**RESPONSE:**

7.      The purchase receipt also contained the phrase "*Sold by: -DEAL-". See*  Jones Depo. at 68-69, 72-73; FOX_AMZ 0002.

**RESPONSE:**

8.      Amazon permitted co-sellers to use a "friendly name" by which it would be identified as a seller of its products.  *See* Jones Depo. at 73-74.

**RESPONSE:**

9.      Amazon contends that Defendant W2M Trading Corporation or "W-Deals" used "-DEAL-" as its "friendly name" when selling items on the Amazon website. *See* Jones Depo. at 73.

**RESPONSE:**

10.     Both Mr. and Mrs. Fox believed the hoverboard was purchased directly from Amazon. *See* M. Fox Depo. at 18-21; B. Fox Depo. at 40-41.

**RESPONSE:**

11.     The hoverboard was shipped via Federal Express from China.  *See* M. Fox Depo. at 15; B. Fox Depo. at 116-117.

**RESPONSE:**

12.     When Plaintiffs received the hoverboard, the shipping box contained the trademark "Amazon" on the outside.  *See* M. Fox Depo. at 15; B. Fox Depo. at 116-117.

**RESPONSE:**

13.     Amazon operates a program known as "Fulfillment by Amazon" or "FBA" in which co-sellers can leave products in Amazon's possession and control in an Amazon Fulfillment Center until the products are purchased. Once a product is purchased, Amazon ships the product.  *See* Jones Depo. at 26.

**RESPONSE:**

14.     In its FBA program, Amazon uses Amazon-labeled boxes.  *See* Jones Depo. at 116-117.

**RESPONSE:**

15.     In 2015, Amazon's FBA program shipped items using Federal Express.  *See* Jones Depo. at 116-117.

**RESPONSE:**

16.     In 2015, Amazon had FBA centers in China.  *See* Jones Depo. at 62.

**RESPONSE:**

3

17.     In 2015, Amazon's product safety team was responsible for product safety and product recalls for items sold directly by Amazon and by co-sellers.  *See* Jones Depo. at 14-15, 49.

**RESPONSE:**

18.     In 2015, Amazon also had product safety employees in Europe.  *See* Jones Depo. at 15.

**RESPONSE:**

19.     The product safety team engaged in the proactive monitoring of customer electronic and telephone contacts, including social media, to look for product safety problems. *See* Jones Depo. at 50.

**RESPONSE:**

20.     Amazon's product safety team also reviewed news reports and notifications from governmental agencies to stay attuned to any potential product safety issue.  *See* Jones Depo. at 50.

**RESPONSE:**

21.     Amazon's customer service employees were instructed to direct any "safety-related contact" to the product safety team, regardless of whether it was a direct sale or a co-sale. *See* Jones Depo. at 51-52.

**RESPONSE:**

22.     In December 2015, Amazon's product safety team demanded that co-sellers provide legal compliance documentation for the hoverboards offered for sale.  This demand included documentation that the hoverboards complied with Underwriters Laboratory ("UL") requirements and United Nations transportation regulations.  *See* Jones Depo. at 137-138.

**RESPONSE:**

23.     Very few co-sellers responded to Amazon's demand for compliance documentation or attempted to satisfy these requirements.  *See* Jones. Depo. at 137-138; Amazon's First Amended and Supplemental Responses to Plaintiffs' First Set of Interrogatories, Response No. 12.

**RESPONSE:**

24.     For many years, Amazon has had a "HazMat" or, more recently renamed, "Dangerous Goods" team.  *See* Jones Depo. at 35.

**RESPONSE:**

25.     The "HazMat" or "Dangerous Goods" team's purpose was to make sure that any potentially dangerous products in an Amazon Fulfillment Center were properly identified and labeled.  *See* Jones Depo. at 36.

**RESPONSE:**

26.     The Dangerous Goods team had a role only with respect to products in Amazon Fulfillment Centers.  The team had no role with products which had not reached an Amazon Fulfillment Center.  *See* Jones Depo. at 178.

**RESPONSE:**

27.     Any product with a lithium ion battery – including hoverboards – fell within the jurisdiction of the Dangerous Goods team if stored or shipped by Amazon.  *See* Jones Depo. at 176-177.

**RESPONSE:**

28.     An e-mail from Rachel Moss, the Director of Amazon's Dangerous Goods team, listed several hoverboard ASINs as "Hazmat" [Hazardous Materials]" in a December 1, 2015 e-mail.  *See* Jones Depo. at 179-180.

**RESPONSE:**

29.     Ms. Moss had no knowledge and no role with respect to those hoverboard ASINs listed as "Hazmat" unless "[t]hey at one time in their history had been in an Amazon FC [fulfillment center]." *See* Jones Depo. at 180.

**RESPONSE:**

30.     On an Amazon document labeled FOX__AMZ 001420-1444, the Fox ASIN [B00WGX04YM] was listed as one of the hoverboard ASINs which qualified as "Hazmat." *See* Jones Depo. at 181; FOX_AMZ 001420-1444.

**RESPONSE:**

31.     The Fox ASIN was in an Amazon Fulfillment Center in 2015. *See* Jones Depo. 178-181; FOX_AMZ 001420-1444.

**RESPONSE:**

32.     The presence of co-sellers on Amazon's website has steadily grown over the years. *See* Jones Depo. at 24.

**RESPONSE:**

33.     Approximately 40% of Amazon's gross revenue comes from co-sales. *See* Jones Depo. at 54.

**RESPONSE:**

34.     Amazon has a "merchant integration team" specifically for the purpose of encouraging and enhancing co-sales. *See* Jones Depo. at 17.

**RESPONSE:**

35.     The purpose of the merchant integration team is to help new co-sellers learn how to list products, how to describe their products on Amazon's website, and how to handle order fulfillment.  *See* Jones Depo. at 17.

**RESPONSE:**

36.     The merchant integration team acts as the "dedicated account manager" for co-sellers by being the point of contact for co-sellers and answering questions or offering other assistances such as creating sample entry on the Amazon spreadsheet.  *See* Jones Depo. at 23.

**RESPONSE:**

37.     The product box containing the hoverboard was labeled "Smart Balance Wheel" and had no information about the co-seller.  *See* Jones Depo. at 135-136, 149-152.

**RESPONSE:**

38.     The product box containing the hoverboard had no information or indication regarding the identity of the manufacturer.  *See* Jones Depo. at 135-136, 149-152; Brian Fox Affid. ¶ 2-3.

**RESPONSE:**

39.     The identity of the manufacturer of the hoverboard sold to Mrs. Fox is still unknown.  *See* Brian Fox Affidavit, ¶ 2-3.

**RESPONSE:**

40.     Plaintiffs never communicated with any person or entity other than Amazon regarding the purchase of the hoverboard. *See* Jones Depo. at 78-79.

**RESPONSE:**

41.     Amazon does not permit any direct communication between a co-seller and Amazon customers. *See* Jones Depo. at 78-79.

**RESPONSE:**

42.     Amazon did not permit co-sellers to have access to the contact information of Amazon's customers. *See* Jones Depo. at 158-159.

**RESPONSE:**

43.     Amazon's Business Solutions Agreement with all of its co-sellers provides in part, "We will provide order information to you for each order of your products through the applicable Amazon site." *See* FOX_AMZ 0021, "Selling on Amazon," ¶ S-1.2.

**RESPONSE:**

44.     Any attempt by a co-seller to communicate with one of Amazon's customers must have Amazon's permission and then flow through an Amazon e-mail address. *See* Jones Depo. at 162-163.

**RESPONSE:**

45.     In November 2015, Amazon began an internal investigation into the dangers of hoverboards sold from the Amazon website. *See* Jones Depo. at 118.

**RESPONSE:**

46.     Amazon worked "almost non-stop" from November 2015 through January 2016 on this investigation.  *See* Jones Depo. at 151.

**RESPONSE:**

47.     The product safety team prepared a written report outlining its investigation.  *See* Jones Depo. at 113; FOX_AMZ 1558-1559.

**RESPONSE:**

48.     This report is dated December 10, 2015.  *See* FOX_AMZ 01558-1559.

**RESPONSE:**

49.     The report was completed just before a meeting on December 10, 2015, which involved approximately twenty Amazon employees, including "a broad set of senior decision-makers."  *See* Jones Depo. at 113; FOX_AMZ 01558-1559.

**RESPONSE:**

50.     These decision-makers included the leadership of the product safety, product quality, and legal teams.  *See* Jones Depo. at 113.

**RESPONSE:**

51.     The singular subject matter of the December 10th meeting was the growing multitude of hoverboard fires and explosions and what Amazon should do in light of these risks. *See* Jones Depo. at 112-114.

**RESPONSE:**

50.    On November 30, 2015, an Amazon customer sent an e-mail to Amazon's CEO Jeff Bezos informing him that a hoverboard from "W-Deals" (i.e. Defendant W2M Trading) had burst into flames while his daughter was riding it with "fire works like explosions." *See* FOX_AMZ 0753-0754.

**RESPONSE:**

51.    The customer reported that the hoverboard fire/explosion had caused substantial damage to his home. *See* FOX_AMZ 0753-0754.

**RESPONSE:**

52.    The customer also reported that his three children had narrowly escaped physical harm when the hoverboard burst into flames. *See* FOX_AMZ 0753-0754.

**RESPONSE:**

53.    The ASIN identified in the email to Mr. Bezos on November 30, 2015, was the same as the Fox ASIN. *See* FOX_AMZ 0753-0754.

**RESPONSE:**

54.    The manufacturer of the hoverboard purchased by the man who had sent the November 30, 2015 e-mail could not be identified. *See* FOX-AMZ 0753-754.

**RESPONSE:**

55.    The product safety team's December 10, 2015 report identified at least 17 hoverboard "fires" or "explosions" in the United States alone from hoverboards sold on Amazon's website. *See* FOX_AMZ 01558-1559.

**RESPONSE:**

56.     Amazon's internal investigation revealed that that only four of the 17 fires in the involved the process of charging the products.  *See* FOX_AMZ 01558-1559.

**RESPONSE:**

57.     By December 10, 2015, Amazon knew that additional fires and explosions had occurred in the United Kingdom.  *See* Jones Depo. at 153, 192-193.

**RESPONSE:**

58.     Amazon's North American Consumer Leadership team was concerned that the reports of fires and explosions may be indicative of a safety issue across all Chinese manufacturers, which constituted the vast majority of the hoverboards being offered for sale.  *See* FOX_AMZ 0795.

**RESPONSE:**

59.     Damon Jones – the leader of Amazon's product safety team – was concerned that the entire hoverboard product category was "bad" because the dangers of fires and explosions were spread across many manufacturers, many brands, and many component parts.  *See* Depo. at 134-136.

**RESPONSE:**

60.   Amazon knew that nearly 250,000 units had been sold in the 30 days before the December 10 report.  *See* Jones Depo. at 114.

**RESPONSE:**

61.     By December 10, 2015, Amazon knew that approximately 25 percent of the units sold in the preceding 30 days had not been delivered.  *See* FOX_AMZ 1693-1694.

**RESPONSE:**

62.     On December 10, 2015, Amazon knew it was likely that the majority of hoverboards sold during the preceding 30 days were unused and would be opened during the holiday season.  *See* Jones Depo. at 244.

**RESPONSE:**

63.     Amazon knew and understood that it was a virtual certainty that more fires and explosions would occur after December 11, 2015.  *See* Jones Depo. at 245, 312-313.

**RESPONSE:**

64.     As a result, Amazon made "contingency plans" in anticipation of more fires and explosions.  *See* Jones Depo. at 245, 310-313.

**RESPONSE:**

65.     This contingency plan included having Amazon employees work on Saturday, December 26, 2015, to monitor any news reports or customers complaints regarding hoverboard fires or explosions.  *See* Jones. Depo. at 243.

**RESPONSE:**

66.     Co-sales constituted nearly all of Amazon's hoverboard sales.  *See* Jones Depo. at 56.

**RESPONSE:**

67.    Amazon had no safety certifications from any of the co-sellers placing hoverboards for sale on the Amazon website.  *See* FOX_AMZ 795; Ooton Depo. 40-41, 83-84.

**RESPONSE:**

68.    Amazon received over $200 million in payments for hoverboards purchased from its website from September 2015 through November 2015.  *See* Jones Depo. at 295; FOX_AMZ 0453.

**RESPONSE:**

69.    Hoverboards were the biggest selling item on Amazon's website for the 2015 Christmas season.  *See* Jones Depo. at 295; FOX_AMZ 0453.

**RESPONSE:**

70.    By December 2, 2015, Amazon had stopped all hoverboard sales worldwide of the precise ASIN purchased by Mrs. Fox as well as other ASINs which posed a clear risk of fire and explosion.  *See* Jones Depo. at 203-206.

**RESPONSE:**

71.    By December 4, 2015, Amazon had recalled all hoverboards sold in the United Kingdom because of an electrical issue creating a serious risk of fire.  *See* Jones Depo. at 191-192

**RESPONSE:**

72.    During the December 10, 2015 meeting, Amazon decided to suspend immediately all hoverboard sales throughout the United States.  *See* FOX_AMZ 1693-1694.

**RESPONSE:**

73.     During the December 10, 2015 meeting, Amazon decided to recommend that the international sales team also suspend all hoverboard sales.  *See* FOX_AMZ 1693-1694.

**RESPONSE:**

74.     During the December 10, 2015 meeting, Amazon decided to send a "non-alarmist" email to United States hoverboard purchasers.  *See* Jones Depo. at 236; FOX_AMZ 1693-1694.

**RESPONSE:**

75.     Amazon stopped selling hoverboards in the United States and worldwide starting on December 11, 2015.  *See*  Jones Depo. at 133.

**RESPONSE:**

76.     On December 12, 2015, Amazon sent the "non-alarmist" e-mail to customers who had purchased hoverboards.  *See* FOX_AMZ 001.

**RESPONSE:**

77.     The email stated the following: "There have been ***news reports of safety issues*** involving products like the one you purchased that contain rechargeable lithium-ion batteries." *See* FOX_AMZ 001.

**RESPONSE:**

78.     Mrs. Fox was one of the Amazon customers who received the "non-alarmist" e-mail which warned of "safety issues."  *See* FOX_AMZ 001.

**RESPONSE:**

79.     The e-mail did not inform customers of the any actions Amazon had already taken in response to hoverboard safety concerns.  *See* FOX_AMZ 001.

**RESPONSE:**

80.     The e-mail did not inform customers that the "safety issues" were the risks of "fire" and "explosion."  *See* FOX_AMZ 001.

**RESPONSE:**

81.     The e-mail did not inform customers that some hoverboards had burst into flames while in use.  *See* FOX_AMZ 001.

**RESPONSE:**

82.      The e-mail did not inform customers that Amazon knew of at least 17 fire and explosion incidents in the United States alone that were caused by hoverboards purchased on Amazon's website.  *See* FOX_AMZ 001.

**RESPONSE:**

83.     The e-mail did not inform customers that some of the 17 fire and explosion incidents had caused significant damage to customers' homes.  *See* FOX_AMZ 001.

**RESPONSE:**

84.     The e-mail did not inform customers that Amazon was very concerned about a possible "uptick" or "large spike" in fire and explosion incidents as hoverboards purchased in the

last 30 to 45 days were put into use for the first time on or about December 25, 2015. *See* FOX_AMZ 001.

**RESPONSE:**

85.    The e-mail did not inform customers that Amazon had decided to stop selling hoverboards worldwide on December 10, 2015, because of the risk of fire and explosion. *See* FOX_AMZ 001.

**RESPONSE:**

86.    The e-mail did not inform customers that Amazon had decided to stop selling certain ASINs, including the exact same product purchased by Mrs. Fox, on December 2, 2015, because of the risk of fire. *See* FOX_AMZ 001.

**RESPONSE:**

87.    The e-mail did not inform customers that Amazon's product safety manager was concerned that the entire hoverboard product category was bad, that the dangers of fires and explosions were spread across many manufacturers, many brands, and many component parts. *See* FOX_AMZ 001.

**RESPONSE:**

88.    The e-mail did not inform customers that Amazon was specifically concerned that the hoverboard fires and explosions might have been indicative of a problem across Chinese manufacturing. *See* FOX_AMZ 001.

**RESPONSE:**

89.     The e-mail did not inform customers that Amazon's source for concern was a "deep dive" internal investigation and that Amazon had multiple additional sources of information other than news reports.  *See* FOX_AMZ 001.

**RESPONSE:**

90.     Hoverboard refunds were limited to nineteen percent (19%) despite the risk of fires and explosions.  *See* FOX-AMZ 500.

**RESPONSE:**

91.     After being told of the decision to suspend all hoverboard sales worldwide, the third-highest Amazon executive sent an e-mail on December 10, 2015, cautioning those in charge of the anticipated e-mail to hoverboard customers that the e-mail to customers would be "headline news."  *See* FOX_AMZ 1693; Jones Depo. at 246-247.

**RESPONSE:**

92.     Mrs. Fox testified during her deposition that had she heard "there was on fire caused by the particular board that I bought, I would not have let it be in my house."  *See* M. Fox Depo. at 99-100.

**RESPONSE:**

93.     Damon Jones – the leader of Amazon's product safety team – purchased a hoverboard for himself and his daughter for Christmas 2015.  *See* Jones Depo. at 82.

**RESPONSE:**

94.     Mr. Jones removed the product from his home in late November 2015 and did not purchase a replacement product.  *See* Jones Depo. at 83-84.

**RESPONSE:**

95.     Early in the case, Plaintiffs sent an interrogatory to Amazon asking for the identity of all entities or individuals which had received any portion of the payment from Mrs. Fox.  Specifically, Plaintiffs asked for the identity of each entity, the date of payment, the payment amount, the account to which each payment was sent, and the reason(s) for each such payment.  *See* Amazon's First Amended and Supplemental Responses to Plaintiffs' First Set of Interrogatories, Interrogatory No. 5.

**RESPONSE:**

96.     Amazon responded as follows, "Amazon will produce a record of all sales for this ASIN and a detail of payments to this seller per Rule 33(d)." *See* Amazon's First Amended and Supplemental Responses To Plaintiffs' First Set of Interrogatories, Response No. 5.

**RESPONSE:**

97.     Despite this response and producing several thousands of pages of documents, Amazon produced no document which showed any exchange of money between Amazon and W2M Trading or "-DEAL-".  *See* Amazon's First Amended and Supplemental Responses To Plaintiffs' First Set of Interrogatories, Response No. 5.

**RESPONSE:**

98.     Pursuant to the Amazon Services Business Solution Agreement ("BSA"), Amazon had complete control over all the money from co-sales, including the right to impose a 90-day hold on the payment of funds.  *See* FOX__AMZ 0007-0028.

**RESPONSE:**

99.     The BSA outlines Amazon's general intention to remit payments to co-sellers every 14 days.  *See* FOX__AMZ 00025.

**RESPONSE:**

100.     The BSA also provides that co-sellers "will not have the ability to initiate or cause payments to be remitted to you."  *See* FOX_AMZ 0025.

**RESPONSE:**

101.     In December 2015, Amazon imposed a 90-day hold on remitting payment for hoverboard sales because Amazon was worried co-sellers would "run off with this money."  See FOX__AMZ 00446-447.

**RESPONSE:**

102.     The hoverboard was the cause of the fire at the Fox house on January 9, 2016.  McVey Affidavit.

**RESPONSE:**

103.     There was no evidence to point to any other potential cause of the fire at the Fox house. McVey Affidavit.

**RESPONSE:**

104.     The lithium ion battery pack in the Fox's hoverboard caused the fire.  Coleman Affidavit.

**RESPONSE:**

105.     The evidence shows that the lithium ion battery pack overheated, leading to the individual batteries being launched across the Fox family room like small burning missiles.  Coleman Affidavit.

**RESPONSE:**

Respectfully submitted,

/s/ Steven E. Anderson
Steven E. Anderson, BPR #13143
Sara F. Reynolds, BPR #21469
Anderson & Reynolds PLC
120 30th Ave. North
Nashville, TN 37203
(615) 942-1700
sanderson@andersonreynolds.com
sreynolds@andersonreynolds.com

/s/Mark E. Spear
Mark E. Spear, BPR #11968
Kaylin. L. Hart, BPR #31874
Spear, Spear & Hamby, P.C.
169 Dauphin Street, Suite 200
Mobile, AL 36602
(251) 344-8181
mes@sshlawpc.com
klh@sshlawpc.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing that a true and exact copy of the foregoing has been served via the Court's CM/EMF system to all parties registered to receive electronic notice on January 31, 2018 including:

Lela Hollabaugh
Fritz Spainhour
BRADLEY ARANT BOULT CUMMINGS LLP
1600 Division Street, Suite 700
Nashville, TN 37203
Telephone: (615) 252-2348
lhollabaugh@bradley.com
fspainhour@bradley.com

Brendan Murphy
Rachel Elizabeth Constantino-Wallace
PERKINSCOIE
1201 Third Avenue
Suite 4900
Seattle, WA 98101
(206)359-6179
bmurphy@perkinscoie.com
rconstantinowallace@perkinscoie.com

*Attorneys for Defendant Amazon.com, Inc.*

And by certified mail, return receipt requested to:

W2M Trading Corporation
c/o Kevin Ma
1643 West 4th Street, Apt. #2R
Brooklyn, N.Y. 11223

/s/ Steven E. Anderson

22