**IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | | |
|---|---|---|---|
| **CHARLES BRIAN FOX, et al.,** | ) | | |
| | ) | | |
| **Plaintiffs,** | ) | | |
| | ) | | |
| **v.** | ) | **NO. 3:16-cv-03013** | |
| | ) | | |
| **AMAZON.COM, INC., et al.,** | ) | **JUDGE CAMPBELL** | |
| | ) | **MAGISTRATE JUDGE FRENSLEY** | |
| **Defendants.** | ) | | |

## MEMORANDUM

### I. Introduction

Pending before the Court are Defendant Amazon's Motion For Summary Judgment (Doc. No. 119), and Plaintiffs' Motion For Partial Summary Judgment (Doc. No. 136). For the reasons set forth below, Defendant Amazon's Motion For Summary Judgment (Doc. No. 119) is **GRANTED**, Plaintiffs' Motion For Partial Summary Judgment (Doc. No. 136) is **DENIED**, and this action is **DISMISSED**.

Also pending before the Court is Plaintiffs' Motion To Exclude Evidence Regarding Reasonableness Of Defendant Amazon.com, Inc.'s Decisions Made During December 10, 2015 Meeting (Doc. No. 106). Through the Motion, Plaintiffs request the Court prohibit Defendant Amazon from introducing certain evidence at trial. Given the Court's disposition of this action, the Motion is **DENIED**, as moot.

### II. Factual and Procedural Background

Plaintiffs Charles Brian Fox and Megan Fox originally brought this action in the Circuit Court for Davidson County, Tennessee, individually and on behalf of their four minor children, Hailey, Matthew, Rebecca, and Sarah, to recover for injuries and other damages they sustained

as a result of a fire at their home allegedly caused by a hoverboard purchased through the Amazon.com website. (Doc. No. 1-2). Plaintiffs named Amazon.com, W2M Trading Corporation, and various Amazon entities as defendants. (*Id.*) The Amazon defendants removed the case to federal court based on diversity of citizenship jurisdiction. (Doc. No. 1). Plaintiffs subsequently filed a Second Amended Complaint, naming Defendants Amazon.com, Inc. and W2M Trading Corporation, and raising the following claims: violation of the Tennessee Products Liability Act, 29-28-101, *et seq*., negligent failure to warn, intentional and/or negligent misrepresentation, and violation of the Tennessee Consumer Protection Act, 47-18-101, *et seq.* (Doc. No. 94). Plaintiffs seek compensatory damages, punitive damages, and treble damages. (*Id.*) Plaintiffs have obtained an Entry of Default as to Defendant W2M Trading Corporation. (Doc. No. 88).

Plaintiffs allege that Plaintiff Megan Fox purchased a self-balancing scooter, more commonly known as a hoverboard, from the Amazon.com website on November 3, 2015 to give to her son, Matthew, for Christmas 2015. (Doc. No. 94, at ¶¶ 6, 9, 10). Plaintiffs further allege that on January 9, 2016, Matthew used the hoverboard, then left it next to a couch on the first floor of their home. (*Id.*, at ¶¶ 11, 12, 13). Later that day, the hoverboard allegedly triggered a fire that consumed the house, and caused physical and psychological injuries to Plaintiffs. (*Id.*¸ at ¶¶ 11-28). The parties do not dispute the hoverboard, specifically the lithium-ion battery pack, was the cause of the fire. (*Id.*, at ¶¶ 102-105).

The parties' statements of undisputed material facts supporting their respective motions for summary judgment include several statements that are more in the nature of argument than fact. Setting aside the argumentative statements, the undisputed material facts are as follows.

2

*Purchase of the Hoverboard*

Amazon.com ("Amazon") is an information service and system designed so multiple users across the world can access its servers and browse its marketplace at the same time. (Doc. No. 147, at ¶ 15). Defendant W2M Trading Corporation, also known as "W-Deals," was a seller that listed and sold products on Amazon.com. (*Id.,* at ¶ 1).[1]  On November 3, 2015, Plaintiff Megan Fox used her existing account with Amazon to purchase the hoverboard at issue here, the FITURBO F1. (Doc. No. 150, at ¶ 2). It is Plaintiffs' position that she bought the hoverboard from Amazon. (Doc. No. 147 at ¶ 2). It is Amazon's position that, although it retails some products on its marketplace, it did not sell the hoverboard at issue here. (*Id.*) Rather, Amazon contends Mrs. Fox purchased the hoverboard from Defendant W2M Trading Corporation, or "W-Deals," through the Amazon marketplace. (*Id.*; Doc. No. 120, at 9).

Prior to Mrs. Fox's purchase, Mr. Fox had investigated hoverboards, which included visiting Amazon's website and reading hoverboard reviews and comparing the component parts. (Doc. No. 150, at ¶ 5).  The hoverboard was described on the webpage as having an "original Samsung advanced battery pack." (*Id.*, at ¶ 3).  Amazon made no statements or representations about the hoverboard, nor did it develop the product detail page content, on the webpage. (Doc. No. 147, at ¶¶ 10, 11).  Amazon did not make any representations to Mrs. Fox about the hoverboard before or at the time she purchased it. (*Id.*, at ¶ 12).  Amazon did not design or manufacture the hoverboard. (*Id.*, at ¶¶ 4-5).

---

[1]    Amazon objects to Plaintiffs' use of the term "co-seller" in referring to W2M Trading Corporation, and prefers the term "third-party seller." (Doc. No. 150, at ¶ 8). Plaintiffs object to the term "third-party seller." (Doc. No. 147, at ¶ 1). The Court simply uses the term "seller" throughout this statement of facts.

After providing her credit card information, Amazon charged Mrs. Fox the entirety of the hoverboard purchase price of $274.79. (Doc. No. 150, at ¶ 4). W-Deals set the price for the hoverboard. (Doc. No. 147, at ¶ 9).

The purchase receipt was sent by "amazon.com," and contained Mrs. Fox's billing address, the shipping address, the order date, shipment date, the detailed description, the purchase price, tax, and receipt number. (Doc. No. 150, at ¶ 6). The purchase receipt also contained the phrase "Sold by: -DEAL-". (*Id.*, at ¶ 7). Amazon permitted sellers to use a "friendly name" by which it would be identified as a seller of its products. (*Id.*, at ¶ 8). Amazon contends that Defendant W2M Trading Corporation or "W-Deals" used "-DEAL-" as its "friendly name" when selling items on the Amazon website. (*Id.*, at ¶ 9). Both Mr. and Mrs. Fox believed the hoverboard was purchased directly from Amazon. (*Id.*, at ¶ 10).

The parties disagree as to whether the hoverboard was shipped by Defendant W2M Trading Corporation or by Amazon. (Doc. No. 147, at ¶¶ 3, 6). They appear to agree the hoverboard was shipped via Federal Express from China. (Doc. No. 150, at ¶ 11). When Plaintiffs received the hoverboard, the shipping box contained the trademark "Amazon" on the outside. (*Id.*, at ¶ 12). The product box containing the hoverboard was labeled "Smart Balance Wheel" and had no information about the seller, or about the identity of the manufacturer. (*Id.*, at ¶¶ 37, 38). The identity of the manufacturer is still unknown. (*Id.*, at ¶ 39).

Amazon operates a program known as "Fulfillment by Amazon" or "FBA" in which sellers can place products in Amazon's possession and control in an Amazon Fulfillment Center until the products are purchased. (*Id.*, at ¶ 13). Once a product is purchased, Amazon ships the product using Amazon-labeled boxes. (*Id.*, at ¶¶ 13-14) In 2015, Amazon's FBA program shipped items using Federal Express, and it had FBA centers in China. (*Id.*, at ¶¶ 15-16).

Amazon contends, however, that Defendant W2M Trading did not use this service. (*Id.*, at ¶¶ 13, 31).

The presence of sellers on Amazon's website has steadily grown over the years. (*Id.*, at ¶ 32). Approximately 40% of Amazon's gross revenue comes from co-sales. (*Id.*, at ¶ 33). Amazon has a "merchant integration team" specifically for the purpose of encouraging and enhancing co-sales. (*Id.*, at ¶ 34). The purpose of the merchant integration team is to help new sellers learn how to list products, how to describe their products on Amazon's website, and how to handle order fulfillment. (*Id.*, at ¶ 35). The merchant integration team acts as the "dedicated account manager" for sellers by being the point of contact for sellers and answering questions or offering other assistance such as creating sample entries on the Amazon spreadsheet. (*Id.*, at ¶ 36).

Plaintiffs never communicated with any person or entity other than Amazon regarding the purchase of the hoverboard. (*Id.*, at ¶ 40). Amazon does not permit any direct communication between a seller and Amazon customers, and did not permit sellers to have access to the contact information of Amazon's customers. (*Id.*, at ¶¶ 41-42).

Amazon's Business Solutions Agreement ("BSA") with all of its sellers provides in part, "We will provide order information to you for each order of your products through the applicable Amazon site." (*Id.*, at ¶ 43). Pursuant to the BSA, Amazon had complete control over all the money from co-sales, including the right to impose a 90-day hold on the payment of funds. (*Id.*, at ¶ 98). The BSA outlines Amazon's general intention to remit payments to sellers every 14 days. (*Id.*, at ¶ 99). The BSA also provides sellers "will not have the ability to initiate or cause payments to be remitted to you." (*Id.*, at ¶ 100). In December 2015, Amazon imposed a 90-day hold on remitting payment for hoverboard sales because Amazon was worried it would "see a

higher return rate and [there would be] a potential [for sellers] to run off with this money." (*Id.*, at ¶ 101; Doc. No. 117-10).

*Facts Relating to Post-Sale Events*

In 2015, Amazon had a product safety team in the U.S. and Europe. (Doc. No. 150, at ¶¶ 17, 18). The product safety team engaged in the proactive monitoring of customer electronic and telephone contacts, including social media, to look for product safety problems. (*Id.*, at ¶ 19). Amazon's product safety team also reviewed news reports and notifications from governmental agencies to stay attuned to any potential product safety issue. (*Id.*, at ¶ 20). Amazon's customer service employees were instructed to direct any "safety-related contact" to the product safety team, regardless of whether it was a direct sale or a co-sale. (*Id.*, at ¶ 21).

In December 2015, Amazon's product safety team demanded sellers provide legal compliance documentation for the hoverboards offered for sale. (*Id.*, at ¶ 22). This demand included documentation that the hoverboards complied with Underwriters Laboratory requirements and United Nations transportation regulations. (*Id.*) Very few sellers responded to Amazon's demand for compliance documentation or attempted to satisfy these requirements. (*Id.*, at ¶ 23). Amazon had no safety certifications from any of the sellers placing hoverboards for sale on the Amazon website. (*Id.*, at ¶ 67).

Amazon has a "HazMat" (more recently renamed, "Dangerous Goods") team to ensure any potentially dangerous products in an Amazon Fulfillment Center were properly identified and labeled. (*Id.*, at ¶¶ 24-26). The Dangerous Goods team had no role with products that had not reached an Amazon Fulfillment Center. (*Id.*) Any product with a lithium-ion battery – including hoverboards – fell within the jurisdiction of the Dangerous Goods team if stored or shipped by Amazon. (*Id.*, at ¶ 27).

Co-sales constituted nearly all of Amazon's hoverboard sales. (*Id.*, at ¶ 66). Amazon received over $200 million in sales for hoverboards purchased from its website from September 2015 through November 2015. (*Id.*, at ¶ 68).

In November 2015, Amazon began an internal investigation into the dangers of hoverboards sold from the Amazon website. (*Id.*, at ¶ 45). Damon Jones, an Amazon employee, worked "almost non-stop" from November 2015 through January 2016 on this investigation. (*Id.*, at ¶ 46). The product safety team prepared a written report, dated December 10, 2015, outlining its investigation. (*Id.*, at ¶¶ 47, 48). The report was completed just before a meeting on December 10, 2015, which involved approximately twenty Amazon employees, including "a broad set of senior decision-makers." (*Id.*, at ¶ 49). These decision-makers included the leadership of the product safety, product quality, and legal teams. (*Id.*, at ¶ 50).

On November 30, 2015, an Amazon customer sent an email to Amazon's CEO Jeff Bezos informing him a hoverboard from "W-Deals" (*i.e.* Defendant W2M Trading) had burst into flames while his daughter was riding it with "fireworks-like explosions," and had caused substantial damage to his home. (*Id.*, at ¶¶ 50a, 51a).[2] The customer also reported that his three children had narrowly escaped physical harm when the hoverboard burst into flames. (*Id.*, at ¶ 52). Plaintiffs contend the ASIN [Amazon Standard Identification Number] identified in the email to Mr. Bezos on November 30, 2015 was the same as the ASIN for the hoverboard they purchased. (*Id.*, at ¶ 53). The manufacturer of the hoverboard purchased by the man who sent the November 30, 2015 email could not be identified. (*Id.*, at ¶ 54).

---

[2] Plaintiffs' Statement of Undisputed Material Facts contains two statements numbered "50" and two statements numbered "51." (Doc. No. 150, at 14). The Court has renumbered those items "50a" and "50b" to avoid confusion.

The product safety team's December 10, 2015 report identified at least 17 complaints of hoverboard fires or explosions in the United States alone from hoverboards sold on Amazon's website. (*Id.*, at ¶ 55). Only four of the 17 customers reported that fires occurred during the process of charging the products. (*Id.*, at ¶ 56). Amazon's North American Consumer Leadership team was concerned the reports of fires and explosions may be indicative of a safety issue across all Chinese manufacturers, which constituted the vast majority of the hoverboards being offered for sale. (*Id.*, at ¶ 58). Damon Jones – the leader of Amazon's product safety team – was concerned the entire hoverboard product category was "bad" because the dangers of fires and explosions were spread across many manufacturers, many brands, and many component parts. (*Id.*, at ¶ 59).

Amazon knew nearly 250,000 units had been sold in the 30 days before the December 10 report. (*Id.*, at ¶ 60). By December 10, 2015, Amazon knew approximately 25 percent of the units sold in the preceding 30 days had not been delivered. (*Id.*, at ¶ 61). On December 10, 2015, Amazon knew it was likely the majority of hoverboards sold during the preceding 30 days were unused and would be opened during the holiday season. (*Id.*, at ¶ 62). Mr. Jones testified he expected to see more complaints about hoverboard fires, smoke, and overheating. (*Id.*, at ¶ 63; Doc. No. 117-5, at 245, 312-13). As a result, Amazon made "contingency plans" in anticipation of more fires and explosions. (*Id.*, at ¶ 64). This contingency plan included having Amazon employees work on Saturday, December 26, 2015, to monitor any news reports or customer complaints regarding hoverboard fires or explosions. (*Id.,* at ¶ 65).

During a meeting on December 10, 2015, Amazon decided to recommend the international sales team suspend all hoverboard sales. (*Id.*, at ¶ 73). During that meeting, Amazon also decided to send a "non-alarmist" email to United States hoverboard purchasers.

(*Id.*, at ¶ 74). After being told of the decision to suspend all hoverboard sales worldwide, the third highest Amazon executive sent an email on December 10, 2015, cautioning other Amazon employees that the email to customers would be "headline news." (*Id.*, at ¶ 91). Amazon stopped selling hoverboards in the United States and worldwide starting on December 11, 2015. (*Id.*, at ¶ 75).

On December 12, 2015, Amazon sent the "non-alarmist" email to customers who had purchased hoverboards. (*Id.*, at ¶ 76). The subject line of the email stated: "Important Product Safety Notification Regarding your Amazon.com Order." (*Id.,* at ¶ 13). The email stated the following: "There have been news reports of safety issues involving products like the one you purchased that contain rechargeable lithium-ion batteries." (*Id.,* at ¶ 77). Mrs. Fox was one of the Amazon customers who received the "non-alarmist" email. (*Id.*, at ¶ 78).

Mrs. Fox had a habit of reading emails sent to her email address, meganfox@comcast.net, and occasionally received emails from Amazon to that email account. (Doc. No. 157, at ¶ 9). She has no recollection of the December 12, 2015 email from Amazon relating to hoverboards, but she does not deny receiving it. (*Id.*; Doc. No. 147, at ¶ 14). Mrs. Fox testified during her deposition that had she heard "there was one fire caused by the particular board that I bought, I would not have let it be in my house." (*Id.*, at ¶ 92).

Plaintiffs argue that the email should have informed customers of the actions Amazon had already taken in response to hoverboard safety concerns. Plaintiffs also argue that the email should have informed customers that: the "safety issues" were the risks of "fire" and "explosion," or that some hoverboards had burst into flames while in use; some of the 17 fire and explosion incidents involving hoverboards had caused significant damage to customers' homes; Amazon was very concerned about a possible "uptick" or "large spike" in fire and explosion

incidents as hoverboards purchased in the last 30 to 45 days were put into use for the first time on or about December 25, 2015; Amazon had decided to stop selling hoverboards worldwide on December 10, 2015, because of the risk of fire and explosion; Amazon had decided to stop selling certain ASINs, including the exact same product purchased by Mrs. Fox, on December 2, 2015, because of the risk of fire; Amazon's product safety manager was concerned that the entire hoverboard product category was bad; the dangers of fires and explosions were spread across many manufacturers, many brands, and many component parts; Amazon was specifically concerned that the hoverboard fires and explosions might have been indicative of a problem across Chinese manufacturing; Amazon's source of concern was a "deep dive" internal investigation; and Amazon had multiple additional sources of information other than news reports. (Doc. No. 150, at ¶¶ 79-89). Hoverboard refunds were limited to nineteen percent (19%) despite the risk of fires and explosions. (*Id.*, at ¶ 90).

## III. Analysis

### A. The Standards Governing Motions For Summary Judgment

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Supreme Court has construed Rule 56 to "mandate[] the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v.* Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In considering a motion for summary judgment, a court must draw all reasonable inferences in favor of the nonmoving party. *See, e.g., Matsushita Elec. Indus. Co., Ltd. v. Zenith*

*Radio Corp.,*475 U.S. 574, 587-88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Shreve v. Franklin County, Ohio,* 743 F.3d 126, 132 (6th Cir. 2014). The court does not, however, make credibility determinations, weigh the evidence, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In order to defeat the motion, the nonmoving party must provide evidence, beyond the pleadings, upon which a reasonable jury could return a verdict in its favor. *Celotex Corp.*, 477 U.S. at 324; *Shreve,* 743 F.3d at 132. Ultimately, the court is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

B. Tennessee Products Liability Act

Defendant Amazon seeks judgment as a matter of law that it is not a "seller" under the Tennessee Products Liability Act of 1978, Tenn. Code Ann. §§ 29-28-101, *et seq.* ("TPLA" or "the Act"). Plaintiffs seek judgment as a matter of law that Amazon is a "seller" under the Act.

A manufacturer or seller of a defective or unreasonably dangerous product may be held liable under the TPLA for injuries caused by the product. Tenn. Code Ann. § 29-28-105. Sellers may be held liable under the Act only if the plaintiff establishes one of the five conditions set forth in Section 29-28-106. Plaintiffs seek to hold Defendant Amazon liable as a seller based on Subsection (4), which provides a seller may be held liable even if it did not manufacture the product where "[t]he manufacturer or distributor of the product or part in question is not subject to service of process in this state and the long-arm statutes of Tennessee do not serve as the basis for obtaining service of process." It is undisputed in this case that the manufacturer of the hoverboard at issue is unknown.

The Act defines the term "seller" as follows:

'Seller' includes a retailer, wholesaler, or distributor, and means any individual or entity engaged in the business of selling a product, whether such sale is for resale, or for use or consumption. 'Seller' also includes a lessor or bailor engaged in the business of leasing or bailment of a product.

Tenn. Code Ann. § 29-28-102(7).  Given both parties moved on the question of whether Amazon was the "seller" of the hoverboard, the Court begins with whether Amazon falls under that definition.

Defendant Amazon argues it is not a "seller" under the Act because it did not hold title to the product, set the price of the product, develop the product offer, or ship the product directly to Plaintiffs. Plaintiffs argue Amazon is a "co-seller" of the hoverboard, along with W2M Trading Corporation, and it acts as a "retailer" or "distributor" of the product because it exercised complete control over the sale and kept the entire purchase price paid by Mrs. Fox. Alternatively, Plaintiffs argue Amazon is "an entity engaged in the business of selling a product."

The parties have not cited to any section of the TPLA defining the term "retailer" or "distributor," nor have they cited to any decisions issued by the Tennessee courts defining the terms.  The Tennessee Supreme Court has explained, however, that in construing the TPLA, courts are to "examine the 'natural and ordinary meaning of the language used' . . . 'without a forced or subtle construction that would limit or extend the meaning of the language.'" *Penley v. Honda Motor Co.*, 31 S.W.3d 181, 185 (Tenn. 2000) (quoting *Tuggle v. Allright Parking Sys., Inc.,* 922 S.W.2d 105, 107 (Tenn.1996)). The Court's obligation is to examine the meaning of the terms as they were used at the time of enactment.

The definition of "seller" has remained essentially unchanged since the TPLA was enacted. *See* Tenn. Code Ann. § 23-2702(c) (1979 Supp.) According to the 1976 version of Webster's Dictionary, the term "distributor" was defined as: "one that markets a commodity;

esp: wholesaler." Webster's Third New International Dictionary 660 (1976). The term "retailer" was defined as "a merchant middleman who sells goods mainly to ultimate consumers." *Id.*, at 1938. The 1968 version of Black's Law Dictionary defined "retailer" as "[a] merchant who buys articles in gross or merchandise in large quantities, and sells the same by single articles or in small quantities." Black's Law Dictionary 1479 (4th ed. 1968). The term "distributor" was not defined.

The more recent definitions are generally consistent. Merriam-Webster's definitions of the terms remains unchanged. Merriam-Webster's Collegiate Dictionary 364 (11th ed. 2003); Merriam-Webster Online Dictionary, http://www.unabridged.merriam-webster.com/unabridged/distributor (last visited May 25, 2018); Merriam-Webster Online Dictionary, http://www.unabridged.merriam-webster.com/unabridged/retailer (last visited May 25, 2018). The 2014 version of Black's Law Dictionary defines "distributor" as "[a] wholesaler, jobber, or other manufacturer or supplier that sells chiefly to retailers and commercial users." Black's Law Dictionary 577 (10th ed. 2014). A "retailer" is defined as "[a] person or entity engaged in the business of selling personal property to the public or to consumers, as opposed to selling to those who intend to resell the items." *Id.,* at 1509.

Plaintiffs have not presented evidence indicating Amazon is a wholesaler, or its customers are "chiefly . . . retailers and commercial users." Therefore, Plaintiffs have failed to show Amazon is a "distributor" under the statute. Plaintiffs have also failed to establish Amazon acts as a "retailer" or other "entity engaged in the business of selling a product." Amazon did not hold title to the product sold here, did not set the price of the product, and did not create the text describing or making representations about the product. Amazon's role in the transaction was to

provide a mechanism to facilitate the interchange between the entity seeking to sell the product and the individual who sought to buy it.

Although there is very little evidence Amazon was involved in shipping the product, even if it were shown Amazon provided storage and shipping services here, the evidence indicates those services are offered to sellers as a way to facilitate the sale. Amazon does not take title to the products for which it offers this service, and performing those services does not transform Amazon into the "seller" of the product.

Plaintiffs' argument that Amazon is a "seller" because it retained all the funds paid by Mrs. Fox in this case, rather than remitting them to W2M Trading Corporation, is not persuasive because it does not reflect the typical Amazon transaction such that Amazon becomes a "seller." The evidence indicates Amazon typically remits payment to sellers every 14 days, and its decision to hold the funds in this case related to concerns with the potential need to satisfy a large number of refund requests. Holding the funds for that purpose does not indicate Amazon exercised control over the product sold by W2M Trading Corporation.

As to Plaintiffs' contention that both Mr. and Mrs. Fox believed they were purchasing the product directly from Amazon, Plaintiffs have not cited any authority indicating the subjective belief of the buyer is a relevant factor to consider in applying the TPLA definition of "seller." Similarly, Plaintiffs have not shown the volume of hoverboard sales on Amazon's website is relevant to the definition.

The Court notes that the conclusion reached here is consistent with that reached by other courts addressing the liability of Amazon under other products liability statutes. In *Oberdorf v. Amazon.com, Inc.*, 295 F.Supp.3d 496 (M.D. Penn. 2017), the district court for the Middle District of Pennsylvania held Amazon was not the "seller" of a dog leash sold on the Amazon

Marketplace for purposes of the Pennsylvania products liability statute. The court reasoned that Amazon, like an auctioneer, "is merely a third-party vendor's 'means of marketing,' since third-party vendors – not Amazon – 'cho[o]se the products and expose[ ] them for sale by means of' the Marketplace." *Id.* (quoting *Musser v. Vilsmeier Auction Co., Inc.,* 522 Pa. 367, 373, 562 A.2d 279 (1989)).

In *McDonald v. LG Electronics USA, Inc.,* 219 F.Supp.3d 533, 542 (D. Md. 2016), the court held Amazon could not be held liable under Maryland's products liability law for a defective battery sold on its website because the plaintiff had not sufficiently alleged the defect was attributable to Amazon. The court described Amazon's role in that case as merely providing a platform for the sale of the product, which was designed, manufactured, sold and shipped by other entities. *Id.*[3]

Plaintiffs alternatively argue Amazon is a "bailor" of the hoverboard, and therefore, satisfies the TPLA definition of "seller." According to Plaintiffs, there is strong evidence the hoverboard was stored and shipped by Amazon, and therefore, Amazon established a bailment relationship with W2M Trading Corporation.

Under Tennessee law, a "bailment" is "a delivery of personalty for a particular purpose or on mere deposit, on a contract express or implied; that after the purpose has been fulfilled, it shall be redelivered to the person who delivered it, or otherwise dealt with according to his

---

[3] Amazon has also filed in the record two unpublished cases also holding it is not a "seller" or "supplier" under Maryland and Ohio law, respectively. *Erie Ins. Co. v. Amazon.com, Inc.,* No. 8:16-cv-02679-RWT (D. Md. Jan. 11, 2018) (Doc. No. 120-3); *Stiner v. Amazon.com, Inc.,* No. 15CV185837 (Lorain Cty. Ohio Court of Common Pleas Sept. 20, 2017) (Doc. No. 120-1).

direction or kept until he reclaims it." *Dispeker v. New S. Hotel Co.,* 213 Tenn. 378, 387, 373 S.W.2d 904, 908, 17 McCanless 378 (1963). A "bailee for hire" under Tennessee law "promises to put the bailed property to no other use than that for which it was hired; to use it well; to take care of it; to restore it at the time appointed; to pay the rent or hire; and finally, in general, to observe whatever is prescribed by the contract of bailment, by law, and by custom." *Dispeker*, 213 Tenn. at 387.

Even if the Court assumes the transaction here involved a bailment relationship, Amazon did not act as the "bailor" of the product, but rather as the "bailee." "Bailees" are not included as part of the TPLA definition of "seller."

Finally, Plaintiffs argue holding Amazon liable as a seller supports the policy justifications of the TPLA by promoting safety in the products sold to the public, and by placing the burden of loss on businesses like Amazon, rather than those who are injured by the products sold on its website. Although one might agree these policy implications justify extending liability to businesses like Amazon, that decision is for the Tennessee legislature as it would require, in the Court's view, an expansion of the Act's current definition of "seller."[4]

C. Negligent Failure to Warn

Plaintiffs next claim Defendant Amazon should be held liable for breaching a duty to warn customers, after the sale, about the fire and explosion risks associated with hoverboards. Amazon argues there is no cause of action for breach of a post-sale duty to warn under Tennessee law. Both parties move for summary judgment on this claim.

---

[4]    To the extent Plaintiffs suggest the Court apply the spirit of the law rather than the actual text, the Court declines to do so.

Although the Restatement (Third) of Torts imposes a post-sale duty to warn under certain circumstances, Tennessee courts have specifically declined to adopt those provisions. *See Irion v. Sun Lighting, Inc.,* 2004 WL 746823, at *17 (Tenn. Ct. App. April 7, 2004); s*ee also Mohr v. DaimlerChrysler Corp,*, 2008 WL 4613584, at *19 (Oct. 14, 2008); *Trevino v. Blitz U.S.A., Inc.,* 2011 WL 1458725 (M.D. Tenn. Apr. 15, 2011).

The Tennessee Supreme Court discussed the parameters of such a claim in *Flax v. DaimlerChrysler Corp.,* 272 S.W.3d 521, 541-42 (Tenn. 2008), but determined that even if Tennessee courts recognized such a claim, it was not implicated by the facts presented at trial:

> Plaintiffs argued their second claim is what is commonly referred to as a 'post-sale failure to warn' claim, a claim that has not been previously recognized in Tennessee. *Irion v. Sun Lighting, Inc.*, No. M2002–00766–COA–R3–CV, 2004 WL 746823, at *17 (Tenn.Ct.App. Apr. 7, 2004). Under the assumption that their second claim was a post-sale failure to warn claim, the plaintiffs argued that the trial court should join the jurisdictions that recognize the post-sale failure to warn claims and adopt the post-sale failure to warn provisions of the Restatement (Third) of Torts. See Restatement (Third) of Torts: Products Liability § 10 (1998). The trial court was persuaded by the plaintiffs' arguments and allowed the plaintiffs to present evidence and argument at trial in support of their second failure to warn claim. At the conclusion of the trial, the jury found the defendants liable on the plaintiffs' second failure to warn claim.

> DCC contends that the trial court erred in recognizing the post-sale failure to warn claim. We agree. Although different states apply the doctrine differently, the vast majority of courts recognizing post-sale failure to warn claims agree that a claim arises when the manufacturer or seller becomes aware that a product is defective or unreasonably dangerous after the point of sale and fails to take reasonable steps to warn consumers who purchased the product. *See, e.g., Lovick v. Wil–Rich*, 588 N.W.2d 688, 693 (Iowa 1999); *Patton v. Hutchinson Wil–Rich Mfg. Co.,* 253 Kan. 741, 861 P.2d 1299, 1313 (1993); *Owens–Illinois, Inc. v. Zenobia,* 325 Md. 420, 601 A.2d 633, 645–46 (1992); *Comstock v. Gen. Motors Corp.,* 358 Mich. 163, 99 N.W.2d 627, 634 (1959); *see also* Douglas R. Richmond, *Expanding Products Liability: Manufacturers' Post–Sale Duties to Warn, Retrofit and Recall*, 36 Idaho L. Rev. 7, 18 (1999). Accordingly, courts apply the traditional failure to warn claim when a manufacturer or seller had knowledge of a defect at the time of sale and apply the post-sale failure to warn claim when a manufacturer or seller learns of the defect after the time of sale.

Victor E. Schwartz, *The Post–Sale Duty to Warn: Two Unfortunate Forks in the Road to a Reasonable Doctrine*, 58 N.Y.U. L.Rev. 892, 893 (1983).

> Unlike plaintiffs in post-sale duty to warn cases, the plaintiffs in this case do not allege that DCC discovered problems with the seatbacks after the time of sale. . . . Accordingly, this case does not present the facts necessary to allow us to consider the merits of recognizing post-sale failure to warn claims. . . . For these reasons, we conclude that the trial court erred by adopting and applying the post-sale failure to warn claim in this case. We express no opinion, however, as to the merits of recognizing that cause of action in an appropriate case.

(footnotes omitted).

Plaintiffs have not cited any authority indicating Tennessee courts have recognized the cause of action since the *Flax* decision was issued. They instead argue the Tennessee Supreme Court would likely recognize such a claim in this case. In a diversity case, a federal court must anticipate how the state's highest court would rule and is bound by the controlling decisions of that court. *In re Dow Corning Corp.*, 419 F.3d 543, 549 (6th Cir. 2005). Appellate court decisions are viewed as persuasive unless it is shown the state's highest court would have decided the issue differently. *Id.* As explained above, the Tennessee Supreme Court has not adopted the post-sale duty to warn cause of action, and the Tennessee appellate courts have specifically declined to do so. The Court has no reason to assume these courts would reverse their position in this case.

Plaintiffs alternatively argue Amazon owed them a duty to warn based on the "special business relationship" that existed between Amazon and Mrs. Fox. Plaintiffs contend this relationship existed as a result of: "(1) Amazon creating a platform upon which a variety of items were available for purchase by Megan and Brian Fox; (2) Amazon permitting the Foxes to sign up for an account in order to purchase items; (3) the Foxes purchasing items from Amazon's website; and (4) Amazon profiting from each Fox family purchase." (Doc. No. 139, at 47).

Tennessee courts have imposed a duty of care, including a duty to warn, in certain cases involving "special relationships." For example, in *Bradshaw v. Daniel*, 854 S.W.2d 865, 872 (Tenn. 1993), the Tennessee Supreme Court held a physician has an affirmative duty to warn identifiable third persons in a patient's immediate family against foreseeable risks associated with a patient's illness. In reaching its decision, the court explained the duty to warn others is limited to cases in which the defendant "stands in some special relationship to either the person who is the source of the danger, or to the person who is foreseeably at risk from the danger." *Id.*, at 871; *see also McClung v. Delta Square Ltd. Partnership*, 937 S.W.2d 891, 899 (Tenn. 1996) (business can be held liable for failing to take reasonable measures to protect customers from foreseeable criminal attacks on premises); *Turner v. Jordan*, 957 S.W. 2d 815, 820 (Tenn. 1997) (psychiatrist has duty of care to protect nurse from violent acts of mentally ill patient); *Biscan v. Brown*, 160 S.W.3d 462, 480-83 (Tenn. 2005) (adult host has duty to protect minor guests and third persons from risks associated with drinking and driving). Other special relationships recognized by the Tennessee courts include that of "'innkeeper and guest, common carrier and passenger, possessors of land and guests, social host and guest, and those who have custody over another.'" *Riggs v. Wright*, 510 S.W.3d 421, 427 (Tenn. Ct. App. 2016) (quoting *Downs ex rel. v. Bush*, 263 S.W.3d 812, 819 (Tenn. 2008)).

The relationship between Amazon and those who use its website to purchase items offered and sold by others is not of the same character as the "special relationships" for which the Tennessee courts impose a duty to warn. Tennessee courts have specifically refused to impose such a duty on manufacturers or sellers, and it is reasonable to assume they would decline to impose that duty on an entity that is neither the manufacturer nor the seller, but instead operates to facilitate the sale.

Plaintiffs alternatively argue Amazon assumed a post-sale duty to warn through the December 12, 2015 email it sent to customers regarding the dangers of hoverboards. Plaintiffs contend Amazon should have more strongly warned Mrs. Fox of the risks of hoverboard fires and explosions.

Tennessee courts have held that one who "assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully." *Biscan v. Brown*, 160 S.W.3d at 482-83 (quoting *Stewart v. State*, 33 S.W.3d 785, 793); s*ee also Grogan v. Uggla*, 535 S.W.3d 864, 872-76 (Tenn. 2017); *Bennett v. Trevecca Nazarene Univ.,* 216 S.W.3d 293, 300 (Tenn. 2007); *Messer Griesheim Industries, Inc. v. Cryotech of Kingsport*, 45 S.W.3d 588, 604-05 (Tenn. Ct. App. 2001). In the case cited by Plaintiffs to support their argument, *Biscan v. Brown*, *supra*, the Tennessee Supreme Court applied Section 324A of the Restatement of Torts (Second) in determining that an adult host voluntarily assumed a duty of care to ensure minor guests who had consumed alcohol did not leave his premises. Section 324A provides as follows:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> > (a) his failure to exercise reasonable care increases the risk of such harm, or
> >
> > (b) he has undertaken to perform a duty owed by the other to the third person, or
> >
> > (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

This Section does not apply here, however, because it contemplates liability to *third parties* based on a defendant's failure to render services adequately. Here, Plaintiffs argue Amazon is

liable to them directly for failing to adequately render the service it undertook (*i.e,* sending a warning through the December 12 email).

Section 323 of the Restatement appears to be a better fit here:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

(a) his failure to exercise such care increases the risk of such harm, or

(b) the harm is suffered because of the other's reliance upon the undertaking.

Restatement (Second) of Torts § 323. Plaintiffs have not discussed this Section, however, nor have they cited any Tennessee cases adopting it. Thus, Plaintiffs have not shown Amazon can be held liable under Tennessee law for voluntarily assuming a duty to warn. As Plaintiffs have failed to establish a viable claim under Tennessee law for negligent failure to warn, Defendant Amazon is entitled to summary judgment on that claim.

D.  Intentional and/or Negligent Misrepresentation

Defendant Amazon seeks summary judgment on Plaintiffs' intentional and/or negligent misrepresentation claim. In their Response (Doc. No. 146, at 11) to Defendant's summary judgment arguments, Plaintiffs indicate their misrepresentation claim is based on the legal concept of misrepresentation by concealment.  Defendant Amazon argues it is entitled to summary judgment on this claim because it had no duty to disclose information to Plaintiffs; its December 12 email about hoverboards did not contain any false representations; and Plaintiffs did not rely on the email as they do not recall ever receiving it.

In *PNC Multifamily Capital Institutional Fund XXVI Limited Partnership v. Bluff City Community Development Corp.,* 387 S.W.3d 525, 550 (Tenn. Ct. App. 2012), the Tennessee

Court of Appeals explained that there are two actionable types of concealment recognized by the Tennessee courts: "where the concealment constitutes a trick or contrivance and when there is a duty to disclose." A concealment cause of action based on a duty to disclose requires the plaintiff to show there exists a special relationship between the parties:

> Fiduciary relationship, confidential relationship, constructive fraud and fraudulent concealment are all parts of the same concept. [T]he nature of the relationship which creates a duty to disclose, and a breach of [that] duty constitutes constructive fraud or fraudulent concealment, *springs from the confidence and trust reposed by one in another, who by reason of a specific skill, knowledge, training, judgment or expertise, is in a superior position to advise or act on behalf of the party bestowing trust and confidence in him.* Once the relationship exists 'there exists a duty to speak . . . [and] mere silence constitutes fraudulent concealment.'

*Id.,* at 549–50 (quoting *Shadrick v. Coker*, 963 S.W.2d 726 (Tenn.1998)). In order to establish the concealment was a "trick or contrivance," a plaintiff must show it was "intended to exclude suspicion and prevent inquiry." *Id.*

Plaintiffs argue a "special relationship" existed in this case because Amazon had more information than the general public about the risks associated with hoverboards. Plaintiffs have not cited any authority, however, imposing a duty to disclose on a party simply because that party has more information than the other party. The nature of the relationship between the parties must be of a type that impels one of the parties to speak. Plaintiffs have not established Amazon's relationship with the numerous consumers who use its platform is the type of relationship for which a "duty to speak" is required. As discussed above, Tennessee courts do not impose a post-sale duty to warn on manufacturers or sellers of a product, and therefore, the Court is not persuaded they would impose a duty to disclose on an entity, like Amazon, that operates to facilitate the sale.

Plaintiffs alternatively argue the December 12 email sent by Amazon constituted a "trick or contrivance" because it was specifically drafted to convince consumers their hoverboards were safe. Plaintiffs have not cited any Tennessee cases that have applied the "trick or contrivance" theory where there was no corresponding duty to disclose. In *Continental Land Company v. Investment Properties Company,* 1999 WL 1129025, at *5 (Tenn. Ct. App. Dec. 10, 1999), the court imposed liability under this theory on a seller, who was also a real estate attorney, for drafting a deed that excluded a portion of property that was the subject of the sales contract:

> As the trial court found, Mr. Brown's immersion in the legal details of the transaction in his capacity as the sole real estate lawyer and title expert gave him the opportunity to exploit his position as the seller, and he clearly did so. On its first page, the warranty deed Mr. Brown prepared listed five limitations on the conveyance, including four easements, none of which are at issue here. Instead of including the changes at issue which he unilaterally made, most of which were also easements, on this first page of the deed along with the other easements, *Mr. Brown hid them in an almost incomprehensible, three page single spaced description* containing only four sentences, three of which are on one page. An experienced real estate attorney would have no easy time comprehending Mr. Brown's description, and Mr. Brown was well aware that Buyer was unrepresented. Both Mr. Wilson and Mr. Kemper testified to their lack of understanding of the description. The surveyor who later surveyed the property also testified to the difficulty in following the description.

*Id.* (emphasis added). The court went on to find the defendant also had a duty to disclose the concealed information based on his status as the seller and the only attorney involved in the transaction. *Id.*, at *6-7.

The December 12 email Plaintiffs contend satisfies the "trick or contrivance" theory provides as follows:

> Hello,
>
> We're contacting you about order # . . . for Fiturbo F1 Two Wheels Mini Smart Self Balancing Electric Scooter.

There have been recent news reports of safety issues involving products like the one you purchased that contain rechargeable lithium-ion batteries. As a precaution, we want to share some additional information about lithium-ion batteries and safety tips for using products that contain them. Please follow the link below for the information and safety tips: . . .

If you'd rather not keep the product, please contact Customer Service to initiate a return: . . .

If you purchased this item for someone else, please pass along this information to the recipient.

We hope to see you again soon.

Sincerely,

(Doc. No. 117-17).

Plaintiffs have not established the language in this email rises to the level of the "trick or contrivance" described in *Continental Land*. At its essence, the email alerts the reader to reports of safety issues involving hoverboard batteries, invites the reader to obtain additional information about those safety issues, and offers refunds to those who wish to return the product. That there was more to be learned about the risks of fire and explosion does not mean this email "tricked" the reader into believing the product was safe. Therefore, having failed to establish a "trick or contrivance" or a duty to disclose, Plaintiffs' misrepresentation by concealment claim fails as a matter of law.

E.  Tennessee Consumer Protection Act

Defendant Amazon also seeks summary judgment on Plaintiffs' claim for violation of the Tennessee Consumer Protection Act ("TCPA"). In their Response (Doc. No. 146, at 11), Plaintiffs indicate their TCPA claim is based on Tennessee Code Annotated Section 47-18-104(b)(2), which prohibits "[c]ausing likelihood of confusion or of misunderstanding as to the

24

source, sponsorship, approval or certification of goods or services." (Doc. No. 146, at 16). Plaintiffs contend Amazon created confusion or misunderstanding as to the source of the hoverboard by permitting W2M Trading Corporation to use the "friendly name" "-DEAL-" on the page where the hoverboard was offered for sale. Use of this friendly name, Plaintiffs argue, led Mrs. Fox to believe Amazon was the seller of the product. Defendant Amazon argues only W2M Trading Corporation can be held liable for choosing the friendly name Plaintiffs argue is confusing, and alternatively, Plaintiffs cannot link their damages to the alleged violation.

Plaintiffs allege, as a result of the TCPA violation, they have suffered "serious personal, psychological, emotional, and financial losses . . ." (Doc. No. 94 at ¶ 66). Plaintiffs describe the financial losses they have suffered as the loss of their house and personal property "[a]s a direct result of the fire." (*Id.,* at ¶ 28).

Section 109(a)(1) of the TCPA provides that "[a]ny person who suffers an ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated, as a result of the use of employment by another person of an unfair or deceptive act or practice . . . may bring an action individually to recover actual damages." Courts have interpreted this provision as precluding recovery for emotional loss and personal injury. *Fleming v. Janssen Pharmaceuticals, Inc.,* 186 F.Supp.3d 826, 834-35 (W.D. Tenn. 2016); *Akers v. Prime Succession of Tennessee*, 387 S.W.3d 495, 509-10 (Tenn. 2012); *Riddle v. Lowe's Home Ctrs., Inc.,* 802 F.Supp.2d 900, 908-09 (M.D. Tenn. 2011); *Birdsong v. Eli Lilly and Co.*, 2011 WL 1259650, *2-3 (M.D. Tenn. Mar. 31, 2011). Thus, Plaintiffs' personal, psychological, and emotional damages are not recoverable under the Act.

To the extent Plaintiffs claim financial losses as a result of the alleged violation, they have not demonstrated their house and personal property were lost "as a result of" the unfair or

deceptive practice alleged. In order to recover under the TCPA, "the alleged 'unfair or deceptive act or practice' must in fact cause the damages of which plaintiff complains." *White v. Early*, 211 S.W.3d 723, 743 (Tenn. Ct. App. 2006).  Assuming Defendant Amazon can be held liable for W2M Trading Corporation's choice of its "friendly name," Plaintiffs have not demonstrated a sufficient causal link between the choice of that name and the loss of their property by fire.  To link the two, Plaintiffs would presumably demonstrate that: the fire and the resulting property loss would not have occurred if Mrs. Fox had not bought the hoverboard; Mrs. Fox would not have bought the hoverboard had W2M Trading used a more revealing "friendly name" on the product detail page; and W2M Trading would have used a more revealing "friendly name" had Amazon taken affirmative steps to require them to do so. The Court is not persuaded this attenuated link between the allegedly deceptive act by Amazon and the resulting damage is sufficient to satisfy the causation requirement of the TCPA. Therefore, the Court concludes Plaintiffs' claimed property loss is not recoverable under the TCPA. Accordingly, Defendant is entitled to summary judgment on Plaintiffs' TCPA claim.[5]

## IV.  Conclusion

For the reasons discussed above, the Court grants summary judgment to Defendant Amazon on all claims, and this action is dismissed.

It is so **ORDERED**.

_____
WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE

---

[5]  Given the Court's disposition of Plaintiffs' claims, it is unnecessary to consider Defendant Amazon's arguments regarding punitive damages and the Communications Decency Act.